**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**Stephen MURPHY, Defendant-Appellant.**

**Nos. 76–2299, 78–3300.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1980.

Decided July 23, 1980.

Rehearing Denied Sept. 26, 1980.

James L. Currer, Jr., Currer & Kayaian, Los Angeles, Cal., on brief; William J. Currer, Jr., Los Angeles, Cal., for defendant-appellant.

Linda A. Schneider, David A. Sirignano, Atty., Washington, D.C., on brief; Rosalind Cohen, Sp. Counsel, Washington, D.C., for plaintiff-appellee.

Before, MERRILL and FERGUSON, Circuit Judges, and SMITH,* District Judge.

FERGUSON, Circuit Judge:

Stephen Murphy appeals from a district court decision permanently enjoining him from violating the registration and anti-fraud provisions of the securities laws and requiring him to mail copies of the court's order to present and future business associates and investors.[1] The court first granted summary judgment for the SEC on the registration violations;[2] then, after a trial on the fraud counts in which defendant put on no evidence, the court entered judgment for the SEC on those counts. Murphy contends that there were disputed material facts which made the grant of summary judgment improper and that the entry of that judgment invalidated the fraud judgment as well. He also argues that the court erred in granting an injunction against registration violations without hearing testimonial evidence and that the court deprived him of due process when it denied his Fed.R.Civ.P. 41(b) motion for dismissal. We affirm.

## I.   *FACTS AND PROCEEDINGS BELOW*

Stephen Murphy formed Intertie, a California company that provided financing, construction, and management of cable television systems, in December, 1971, and he was its president and director until February, 1974, when he became vice-president, treasurer and director. In May, 1975, he resigned from these positions after an unsuccessful proxy fight, but he regained control of the company in August, 1975, and became chairman of the board.

Intertie's business involved the promotion of approximately 30 limited partnerships to which it sold cable television systems. Most commonly, Intertie would buy a cable television system, making a cash down payment and financing the remainder, and then sell it to a partnership for a cash down payment and non-recourse promissory notes in favor of Intertie and lease it back from the partnership. Murphy was the architect of this financing scheme, by which Intertie took in approximately $7.5 million from 400 investors. Intertie engaged International Securities Corporation (ISC), a securities brokerage firm, to sell most of these partnership interests, and it agreed that ISC would receive a 10 percent sales commission. ISC's president, Jack Glassford, and ISC shared a three percent commission override. From this three percent, starting in the summer of 1974, Murphy received a one-half percent commission on the sales of partnership interests.

Under ISC's sales program, representatives contacted potential investors to interest them in purchasing limited partnership shares in cable television systems. An ISC sales representative was usually the general partner in the venture. Intertie and ISC did not register the limited partnership interests as securities but relied on the private offering exemption of § 4(2) of the Securities Act, 15 U.S.C. § 77d(2) (1971), and on Rule 146, 17 C.F.R. § 230.146 (1979), which provides a "safe harbor" for private placements that meet certain specified conditions.

Intertie took no steps to assure that the offering and sale were directed only to a small number of sophisticated, informed investors; in fact, it did not even number its memoranda so that it could monitor the

---

* Honorable Russell E. Smith, Senior United States District Judge for the District of Montana, sitting by designation.

1. Murphy also appeals the district court's April 15, 1976 entry of preliminary injunction against him on both the registration and fraud counts. Because the court later entered a permanent injunction, which we affirm, the appeal from the grant of a preliminary injunction is moot. *See* 7 Moore's Federal Practice Part 2, ¶ 65.-04[1] (1979).

2. Before the court granted summary judgment against Murphy, it entered permanent injunctions against additional named defendants, who had consented to the entry of judgments against them. These defendants were Intertie; International Securities Corporation (ISC); Jack Glassford, who was president of ISC and had nearly a 20 per cent interest in Intertie; and H. D. Thoreau, who was an officer of Intertie with 20 per cent ownership.

volume of offers made. Moreover, Murphy in his deposition stated that he felt that information on qualifications of investors was often inadequate. Intertie relied on ISC to comply with the securities laws and agreed by letter to take whatever steps ISC requested for compliance. There was no written contract allocating this responsibility to ISC, however. Neither Intertie nor ISC assured that offeree representatives that the investors used were capable of providing informed advice, even though Murphy doubted the competence of many of the offeree representatives he met.[3] Some of the representatives were salesmen for ISC and a few acted as both salesman and general partner for a partnership.

ISC's salesmen promoted sales of the partnership interests with offering memoranda describing Intertie as "the undisputed industry leader" and a company which could purchase, construct and operate cable television systems "better, faster, more profitabl[y] and with less invested capital than ever before." The memoranda, the salesmen, and Intertie did not disclose that Intertie was losing money, had large short-term debt obligations in connection with the acquisition of the cable television facilities which it resold to the limited partnerships, and could not continue to meet obligations of existing partnerships without refinancing debts or obtaining capital from new partnerships. Nor did they disclose that Intertie was commingling the funds from the various partnerships.

Offering memoranda represented that Intertie had "only a limited history of operations" and did not reveal that Intertie had sold cable systems to at least eight or nine partnerships by January, 1974, and at least twenty by August, 1974. The memoranda also projected that sale and lease-back arrangements would generate from six to ten percent cash flow, but they did not reveal that this flow depended upon Intertie's ability to generate new funds through marketing additional systems, since the early revenues were sometimes inadequate to meet costs.[4] Often, projections for subscriber revenue significantly exceeded the amounts that Intertie later took in from a system.

The memoranda also stated that brokerage commissions would not exceed 10 percent and that tax benefits would arise from the partnership. Intertie continued to make the latter representations even after the Internal Revenue Service in 1974 questioned certain deductions taken in connection with a 1972 partnership. In addition, the memoranda described a negotiation and management role for the general partners that many of them did not assume, since most were ISC employees with little or no knowledge of the operation of cable systems.

Murphy participated heavily in the offerings. He prepared or reviewed Intertie's offering memoranda and sales brochures and sometimes revised language written by Intertie's lawyers; he drafted other materials for distribution to offerees of limited partnership interests; he met with ISC salesmen and with potential investors and their representatives, if any, to give them information about Intertie; and he presented the Intertie investment plan at sales seminars with broker-dealers.

Murphy did not make Intertie's financial statements available to the investors. In his deposition, he described Intertie's response to requests for financial information:

> [S]ome guys called up particularly early in '74 and said, "I have a potential investor and want to see Intertie's financial statement," and they were told, "if that is a condition, we are not going to furnish it."

.    .    .    .    .

---

3. When asked at his SEC deposition about the offeree representatives, Murphy said: "Some are extremely competent and know the questions to ask and pursue it and ask it and others . . . God help the investors is kind of my feeling about the offeree representatives."

4. One memorandum (for a system called Great Lakes) also failed to disclose Intertie's crossing debt, i. e., the amount that Intertie owed on its purchase of the system.

[After June, 1974] [w]e generally answered their request by indicating that we did not feel . . . the Intertie statement was . . . required under Rule 146 and that we did not have the financial strength to be the guarantor of the lease or give the investor any place . . . where they would be able to look for some degree of security and if that did not solve the problem and they pushed for it, generally we would comply with it. But only after that process. Frankly, we didn't want to give the thing out.

By September, 1974, the company had a serious working capital deficiency and a negative net worth of over $600,000; its current assets were $2.3 million; its current liabilities were $6.4 million. Throughout 1974, Intertie used funds generated from new partnership offerings to meet Intertie's debt service obligations on prior systems. Included in those funds were investments from two limited partnerships for systems in New Mexico, which Intertie never built, although it prepared tax returns on behalf of the partnerships and took an investment tax credit and accelerated depreciation on the non-existent facilities. In December, 1975, Murphy filed a petition for Chapter XI bankruptcy for Intertie, and Intertie is now a debtor in possession with Murphy as president.

In 1975, the SEC brought suit against Murphy and other defendants, charging violations of the registration and fraud provisions of the securities laws, and seeking injunctive relief. On March 6, 1978, the district court granted summary judgment for the SEC on the registration count, § 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a), (c) (1971). The court issued a permanent injunction against acts in violation of the registration provisions of the 1933 Act. The SEC then proceeded to trial on the fraud counts, § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1970); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970) and Rule 10b–5, 17 C.F.R. 240.10b–5 (1979), pro-

mulgated thereunder. Murphy moved for dismissal of the action under Fed.R.Civ.P. 41(b), arguing that the Commission had not shown a reasonable likelihood of future violations, a prerequisite to entry of an injunction against him. The court denied the motion, stating that plaintiff had made out a prima facie case, and defendant rested without introducing any evidence.

The court entered judgment for the SEC on September 19, 1978, enjoined Murphy from future violations, and directed that he send copies of the court's order to (1) each investor in each limited partnership that had a relationship with Intertie; (2) all present and future officers and directors of Intertie and Xanadex (another of Murphy's cable television companies); (3) the general partner of any limited partnership which leases equipment or assets to Intertie or Xanadex; and (4) any securities brokerage firm engaged by Murphy, Intertie or Xanadex to sell interests in limited partnerships with relationships with Intertie or Xanadex.

Murphy alleges error in all of the above-listed decisions.

## II. SUMMARY JUDGMENT ON THE REGISTRATION COUNT

The district court granted summary judgment for the SEC on the registration count, finding a violation of § 5(a) and (c) of the 1933 Act, 15 U.S.C. § 77e(a) and (c) (1970), which forbid offers and sales of securities in interstate commerce unless a registration statement is in effect for the security.

The defendant argues that the court's grant of summary judgment on the registration count was inappropriate because there were disputed facts material to the following issues: whether the limited partnership interests were securities, whether the securities were exempt from registration, whether the transactions were covered by the securities laws, and whether his activities were sufficient to subject him to liability.[5]

5. Murphy also argues that because the parties stipulated in the pretrial order that certain is-

sues of fact were contested, the order deprived the district court of the authority to grant sum-

The standard for granting summary judgment is well known:

> "Summary judgment is 'proper only where there is no genuine issue of any material fact or where viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law.'" *Great Western Bank & Trust [v. Kotz],* 532 F.2d [1252,] 1254 [(9th Cir. 1976)], (quoting *Caplan v. Roberts,* 506 F.2d 1039, 1042 (9th Cir. 1974)). Our standard of review is the same in securities litigation. *Id.*

*Smith v. Gross,* 604 F.2d 639, 641 (9th Cir. 1979).

■ Initially, the moving party has the burden under Fed.R.Civ.P. 56(c) of showing absence of a genuine issue of material fact, *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Neely v. St. Paul Fire & Marine Ins. Co.,* 584 F.2d 341, 343–44 (9th Cir. 1978); but if the movant satisfies the initial burden, then the burden shifts to the opponent to come forward with specific facts showing that there remains a genuine factual issue for trial. Fed.R.Civ.P. 56(e); *id.* at 344. The opponent must present these facts in evidentiary form; he cannot rest on his pleadings. *United States v. Allen,* 578 F.2d 236, 237 (9th Cir. 1978); *Smith v. Saxbe,* 562 F.2d 729, 733 (D.C. Cir. 1977). Moreover, the evidence he offers in opposition to the motion for summary judgment must be "significantly probative" as to any fact claimed to be disputed. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. Los Angeles County,* 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

Applying these standards, a reviewing court must examine the record to determine whether there was an absence of dispute as to the facts material to a registration violation. We have examined the pleadings, pretrial order, affidavits, and depositions, including Murphy's testimony before the SEC, and the conclusions that follow reflect all inferences that can be drawn from those facts in the light most favorable to Murphy. *See Spectrum Financial Cos. v. Marconsult, Inc.,* 608 F.2d 377, 380 (9th Cir. 1979).

## A. Elements of a Section 5 Violation

■ Section 5 of the 1933 Act forbids the offer or sale of unregistered securities in interstate commerce, 3 L. Loss, Securities Regulation 1693 (2d ed. 1961), but § 5 does not apply if the securities are exempt from registration as a private offering, § 4(2), 15 U.S.C. § 77d(2) (1970), or are not offered or sold in a transaction by an issuer, underwriter or dealer, § 4(1), 15 U.S.C. § 77d(1) (1970).

### 1. Security

■ Murphy argues on appeal that the shares in limited partnerships in the cable television systems were not securities. That argument is disingenuous. An investment contract is a security. § 2(1), Securities Act of 1933, 15 U.S.C. § 77b(1) (1971); § 3(a)(10), 15 U.S.C. § 78c(a)(10) (1971). Under the test for an investment contract established in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), a limited partnership generally is a security, *Goodman v. Epstein,* 582 F.2d 388, 408–09 (7th Cir. 1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *McGreghar Land Co. v. Meguiar,* 521 F.2d 822, 824 (9th Cir. 1975); 1 A. Bromberg, Securities Law: Fraud § 4.6 (332) (1969), because, by definition, it in-

---

mary judgment on those issues. This contention is incorrect. Even where a pretrial order specifies that certain issues should be tried, the trial judge "may subsequently grant a motion for summary judgment on the ground that those issues are not really in dispute." 6 Moore's Federal Practice ¶ 56.02[5] at 56–36 (1979). *See Irving Trust Co. v. United States,*

221 F.2d 303, 305 (2d Cir.), *cert. denied,* 350 U.S. 828, 76 S.Ct. 59, 100 L.Ed. 740 (1955). *Accord, Singer v. Rehm,* 334 F.2d 240, 241 (10th Cir. 1964). Otherwise, a party could prevent summary judgment simply by refusing to stipulate to certain uncontested facts in a pretrial order.

volves investment in a common enterprise with profits to come solely from the efforts of others. *See SEC v. W. J. Howey Co., supra,* 328 U.S. at 301, 66 S.Ct. at 1104; *Black v. Payne,* 591 F.2d 83, 87 (9th Cir.), *cert. denied,* 444 U.S. 867, 100 S.Ct. 139, 62 L.Ed.2d 90 (1979); SEC Release No. 33–3877, 32 Fed.Reg. 11705 (1967). In *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), this court held that it would not confine the *Howey* test to situations where the term "solely from the efforts of others" applied literally, but would find that element satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 482. Here the investors had no managerial role whatsoever: the limited partnership interests clearly are securities.

### 2. *Unregistered and Sold in Interstate Commerce*

Murphy admitted in the pretrial order that the limited partnership interests were not registered, and he offered nothing to rebut the SEC's evidence that the securities were offered and sold in interstate commerce.

### 3. *Not Exempt from Registration*

▉ Murphy contends, however, that the limited partnership interests were exempt from registration under the private offering exemption in § 4(2) of the 1933 Act, 15 U.S.C. § 77(d)(2) (1970), or under Rule 146, 17 C.F.R. § 230.146 (1979), which each exempt certain private placements. These exemptions from registration provisions are construed narrowly, *SEC v. Blazon Corp.,* 609 F.2d 960, 968 (9th Cir. 1979), in order to further the purpose of the Act: "To provide full and fair disclosure of the character of the securities, . . . and to prevent frauds in the sale thereof . . ." Securities Act of 1933, Ch. 38, Tit. 1, 48 Stat. 74 (1933). Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Doran v. Petroleum Management Corp.,* 545 F.2d 893, 899 (5th Cir. 1977); *Pennaluna & Co v. SEC,* 410 F.2d 861, 865 (9th Cir. 1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970).

On a motion for summary judgment, however, "it is the moving party who carries the burden of proof; he must show that no genuine issue of material fact exists . . . even though at trial his opponent would have the burden of proving the facts alleged." *Doff v. Brunswick Corp.,* 372 F.2d 801, 805 (9th Cir. 1966), *cert. denied,* 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed.2d 71 (1967). *See also BAW Mfg. Co. v. Slaks Fifth Avenue, Ltd.,* 547 F.2d 928, 930–31 (5th Cir. 1977). Thus, the SEC was entitled to summary judgment only if it demonstrated that there was no genuine issue of material fact as to Murphy's affirmative defense or that, viewing the evidence and the inferences which could be drawn therefrom in the light most favorable to Murphy, the SEC was clearly entitled to prevail as a matter of law. *See Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1254 (9th Cir. 1976); 6 Moore's Federal Practice Part 2 ¶ 56.17[4] (1979). After reviewing the pleadings and the affidavits that were before the district court on the summary judgment motion, we have concluded that there was no genuine issue of material fact and that, therefore, the court's grant of summary judgment was proper.

The question whether the sales of limited partnership interests in Intertie's cable systems were entitled to exemption from registration requirements as private offerings is a very difficult one. The difficulty does not preclude summary judgment, however, because it arises not from complex or disputed facts but, instead, from the application of well-settled law to undisputed, albeit unusual, factual circumstances.

A court assessing the availability of a private offering exemption focuses upon

the issuer and the offerees, paying particular attention to the relationship between the two. *See, e. g., Cook v. Avien, Inc.,* 573 F.2d 685, 691 (1st Cir. 1978); *Doran v. Petroleum Management Corp., Inc., supra,* 545 F.2d at 900–02; *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 690 (5th Cir. 1971). This assessment often requires a careful inquiry into the facts surrounding the offering, *see, e. g., Doran v. Petroleum Management Corp., Inc., supra,* 545 F.2d at 900–04; *Parvin v. Davis Oil Co.,* 524 F.2d 112, 118 (9th Cir. 1975); *SEC v. Asset Management Corp.,* [1979] Fed.Sec.L.Rep. (CCH) ¶ 97,278 at 96,-970 (S.D.Ind.1979), and, of course, it requires knowledge of who was the issuer of the securities. The problem in this case, as the SEC conceded at oral argument, is that it is not clear who was the issuer of the securities at suit.

■ As defined in the 1933 Act, " 'issuer' means every person who issues or proposes to issue any security." § 2(4), 15 U.S.C. § 77b(4) (1970). In a corporate offering, the issuer generally is the company whose stock is sold. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 120, 73 S.Ct. 981, 982, 97 L.Ed. 1494 (1953); *SEC v. Koracorp Industries,* 575 F.2d 692, 695 (9th Cir.), *cert. denied sub nom. Helfat v. SEC,* 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978); *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1045 (2d Cir. 1976), *cert. denied sub nom. Homans v. SEC,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 (2d Cir. 1972); *Quinn & Co. v. SEC,* 452 F.2d 943, 945 (10th Cir. 1971), *cert. denied,* 406

U.S. 957, 92 S.Ct. 2059, 32 L.Ed.2d 344 (1972); *Pennaluna & Co. v. SEC,* 410 F.2d 861, 864, (9th Cir. 1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970). Here there is no company issuing stock, but instead, a group of individuals investing funds in an enterprise for profit, Cal.Corp. Code § 15006(1), and receiving in return an entitlement to a percentage of the proceeds of the enterprise. That entitlement, a partnership share, is similar to a share of stock, however; and, just as a share of stock is considered issued by the corporation, so should a partnership share be considered issued by the partnership.[6]

Few courts have confronted this question, because the bulk of securities litigation involving partnerships has concerned allegations of fraud, where it was unnecessary to determine who was the issuer.[7] Moreover, even those courts assessing registration violations involving limited partnerships have given little or no discussion to the issuer question but have simply treated as the issuer the entities that organized the partnerships and determined the success or failure of their enterprises. *See Doran v. Petroleum Management Corp., supra,* 545 F.2d at 897–99, 901–04; *SEC v. Asset Management Corp., supra,* [1979] Fed.Sec.L.Rep. at 96,969; *Bayoud v. Ballard,* 404 F.Supp. 417, 420–23 (N.D.Tex.1975).

As has been emphasized repeatedly, the purpose of the Securities Acts is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953); *see Tcherepnin v.*

---

**6.** Similarly, where the securities are fractional interests in oil, gas or other mineral rights, "the term 'issuer' means the owner of any such right or of any interest in such right (whether whole or factional) who creates fractional interests therein for the purpose of public offering." Securities Act of 1933, § 2(4), 15 U.S.C. § 77b(4) (1970); *see Mason v. Marshall,* 412 F.Supp. 294, 297 (N.D.Tex.1974), *aff'd,* 531 F.2d 1274 (5th Cir. 1974).

**7.** In the fraud cases, the general partner is the defendant because he is the defrauding party. *See, e. g., Goodman v. Epstein,* 582 F.2d 388 (7th Cir. 1978), *cert. denied,* 440 U.S. 939, 99

S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Hirsch v. du Pont,* 553 F.2d 750 (2d Cir. 1977); *Cohen v. Franchard Corp.,* 478 F.2d 115 (2d Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973); *Wittenberg v. Continental Real Estate Partners,* 478 F:Supp. 504, 507 (D.Mass. 1979); *Bartels v. Algonquin Properties, Ltd.,* 471 F.Supp. 1132 (D.Vt.1979); *Houlihan v. Anderson-Stokes, Inc.,* 434 F.Supp. 1319 (D.D.C. 1977); *Halperin v. Edwards & Hanley,* 430 F.Supp. 121 (E.D.N.Y.1977); *Weinberger v. New York Stock Exchange,* 403 F.Supp. 1020 (S.D.N.Y.1975).

*Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). The Acts constitute a comprehensive plan to insure this protection by requiring the filing of a registration statement containing material facts bearing upon the investment merit of securities which are publicly offered. *SEC v. Continental Tobacco Co. of South Carolina*, 463 F.2d 137, 154 (5th Cir. 1972).

In determining that a security qualifies as a private offering, then, we must make sure that the offerees are provided with or given access to the information that is material to their investment decision. *See Doran v. Petroleum Management Corp., supra*, 545 F.2d at 903. Information is material if there is substantial likelihood that a reasonable person would consider it important in deciding whether to invest. *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273, 1293 (9th Cir. 1979). In a corporate setting, the most obviously material information would be facts concerning the issuer, the corporation. In a limited partnership setting, information about the issuer—the partnership—would be of no value if the partnership did not predate the investor's entry into the venture, and it might be of little value even if the partnership did have a history of operation. In the latter case, information about the partnership's previous record would be material, but it would not, alone, be sufficient. The information crucial to the investment decision would be that concerning the entity which was responsible for the success or failure of the enterprise. *Cf.* Schedule A of the Securities Act ¶ 27, 15 U.S.C. § 77aa (1971) (requiring that the issuer furnish profit and loss statements of any business to be purchased with the proceeds of the offering).

Considered from this perspective, the treatment of defendants as issuers in the three cases cited above is clearly appropriate because in each case the defendants whom the court considered issuers would determine the value of plaintiff's investment.[8]

Here, Murphy himself conceded that information about Intertie's finances was material to the decision whether to invest in a limited partnership that Intertie promoted. Given the realities of Intertie's financing scheme, that concession was unavoidable. Intertie developed the partnership offering plan and assumed a major role in engaging investors. It engineered and operated the systems from which the investors would receive their returns. It managed many of the partnerships and it prepared tax forms for most of them. Without generating new capital through continued partnership offerings, Intertie could not meet its obligations on the systems sold to previous investors.

For all these reasons, Intertie clearly held the key to success or failure of the partnerships. Accordingly, Intertie was the entity

---

8. In *Doran v. Petroleum Management Corp., supra*, and *Bayoud v. Ballard, supra*, it is also possible that the courts undertook a more technical analysis *sub silentio*. Under the priniples of partnership law, the general partner, who frequently is also the organizer of the partnership, is liable for any acts that the partnership commits. Uniform Partnership Act § 15. Thus, the courts may have held the corporations to be issuers through a two-step process that they did not articulate: first, finding, as they must, that the partnership itself was the issuer of the securities, and next, holding the general partner derivatively liable for the partnership's acts as issuer. In *Bayoud*, the court treated the general partner, B & C Corporation, as the issuer. 404 F.Supp. at 423. In *Doran*, despite the court's characterization of the "special participant" interests as limited partnership shares, the court could have regarded PMC as a general partner. Two factors suggest that the court may have done so. First, when the court characterized "special participants" as limited partners, it was discussing the offerees, such as Doran. PMC was not an offeree but instead was the organizer and offeror of the shares. Second, PMC behaved like a general partner. It provided Doran with information on the operation and results of the venture and appeared to have the managerial authority that a general partner possesses. A limited partner would lose his status as limited partner if he exercised such control. *See* Uniform Partnership Act § 7. Moreover, the opinion discusses no other entity that could have been general partner of the partnership. Thus, the court may have considered PMC to be an issuer because it was a general partner.

about which the investors needed information, and, therefore, it is properly considered the issuer of the securities for purposes of determining the availability of a private offering exemption.[9]

It is important to understand the limits of this conclusion. We recognize that securities regulation "is often a matter of the hound chasing the hare as issuers devise new ways to issue their securities and the definition of a security itself expands." *Doran v. Petroleum Management Corp., supra*, 545 F.2d at 909. We insert a cautionary note because, like the Fifth Circuit in *Doran*, "[w]e are conscious of the difficulty in formulating black letter law in this area in light of the multiplicity of security transactions and their multifarious natures." *Id.* Accordingly, we note that our holding today does not mean that anyone who has information material to an investment decision is transformed into an issuer. We hold only that when a person organizes or sponsors the organization of limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer for purposes of determining the availability of the private offering exemption.[10]

a. *Private Offering Exemption: § 4(2)*

For nearly 30 years, the Supreme Court's opinion in *SEC v. Ralston Purina Co., supra*, has provided the framework for private offering analysis. In *Ralston Purina*, the Court held: "[T]he applicability of [§ 4(2)] should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" 346 U.S. at 125, 73 S.Ct. at 984. The Court there concluded that the company's offering to "key employees," who included stock clerks and bakeshop foremen, did not fall within the exemption because the employees "were not shown to have access to the kind of information which registration would disclose."[11] *Id.* at 127, 73 S.Ct. at 985.

■ Building on these concepts, courts have developed flexible tests for the private offering exemption, focusing upon: (1) the number of offerees, *Doran v. Petroleum Management Corp., supra*, 545 F.2d at 900; *SEC v. Continental Tobacco Co. of South Carolina*, 463 F.2d 137, 158 (5th Cir. 1972); *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 687 (5th Cir. 1971); *see Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir. 1978); (2) the sophistication of the offerees, *Cook v. Avien, Inc., supra*, 573 F.2d at 691; *Doran v. Petroleum Management Corp., supra*, 545 F.2d at 902; *Hill York Corp. v. American International Franchises, Inc., supra*, 448 F.2d at 690; (3) the size and manner of the offering, *Doran v. Petroleum Management Corp., supra*, 545 F.2d at 900; *SEC v. Continental Tobacco*

9. This result draws support also from the Act's definition of issuer in the context of oil and gas rights. *See* n.7, *supra*. In *Mason v. Marshall, supra*, 412 F.Supp. at 297, the defendant Jack Houston Drilling Company began without the participation of the plaintiffs, who purchased interests in drilling ventures in 1972 and 1973. In those circumstances, it was clear under the definition that the partnership was the issuer of the securities. The analysis propounded in the text would lead to the same conclusion. Jack Houston would be considered the issuer because it was responsible for the success or failure of the drilling venture in which plaintiff invested, because the drilling company formed the series of ventures, designated the exact location of the drilling sites involved, and provided the drilling rigs that were used.

10. We leave to another day the determination whether one of these factors, alone, can be sufficient to require a finding that a person is an issuer of securities.

11. This holding has become the central feature in analysis of the private offering exemption. *See General Life of Missouri Investment Co. v. Shamburger*, 546 F.2d 774, 781 (8th Cir. 1976); *Doran v. Petroleum Management Co., supra*, 545 F.2d at 905–06; *Parvin v. Davis Oil Co.*, 524 F.2d 112, 118 (9th Cir. 1975); *Andrews v. Blue*, 489 F.2d 367, 373 (10th Cir. 1973); *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 678 (4th Cir.), *cert. denied*, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967); *SEC v. Tax Service, Inc.*, 357 F.2d 143, 144–45 (4th Cir. 1966); *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir.), *cert. denied*, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959).

*Co. of South Carolina, supra,* 463 F.2d at 158; *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 689; and (4) the relationship of the offerees to the issuer, *Cook v. Avien, Inc., supra,* 573 F.2d at 691; *Doran v. Petroleum Management, Inc., supra,* 545 F.2d at 902; *SEC v. Continental Tobacco Co. of South Carolina, supra,* 463 F.2d at 158; *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 687. The party claiming the exemption must show that it is met not only with respect to each purchaser, but also with respect to each offeree. *Lively v. Hirschfeld,* 440 F.2d 631, 633 (10th Cir. 1971).

### (1). *The Number of Offerees*

The *Ralston Purina* decision made it clear that there was no rigid limit to the number of offerees to whom an issuer could make a private offering. *SEC v. Ralston Purina Co., supra,* 346 U.S. at 125, 73 S.Ct. at 984. Nonetheless, while the number of offerees, itself, is not decisive, *Doran v. Petroleum Management Corp., supra,* 545 F.2d at 901, "the more offerees, the more likelihood that the offering is public," *id.; Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 688. Murphy introduced no evidence below to suggest that the number of offerees was small or that there was even any attempt to monitor the number of offerees at all.

The SEC introduced Murphy's deposition, in which he stated that offering memoranda were not numbered. Apparently, then, no one knows how many offerees ISC contacted on any of the partnership offerings. Once the SEC provided evidence that there was no control placed on the number of offerees, it was incumbent upon Murphy, in opposing summary judgment, to rebut that evidence. *See Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 691. *See also Doran v. Petroleum Management Corp., supra,* 545 F.2d at 901. Without introducing evidence on the num-

ber of offerees, Murphy could not satisfy even the small burden imposed on a party resisting summary judgment.

Moreover, the SEC contends that we should look at the number of offerees not on an individual system basis, but in the aggregate. It argues that each offering of limited partnership interests was part of an overall plan for financing Intertie's operations and that, therefore, the offerings should be considered integrated. *See* 1 L. Loss, Securities Regulation 578 (2d ed. 1961). *See also Bayoud v. Ballard,* 404 F.Supp. 417, 424 (N.D.Tex. 1975).[12]

■ In Securities Act Release No. 4552 (Nov. 6, 1962), 27 Fed.Reg. 11316, the Commission set out five factors to be used in determining whether to consider apparently separate offerings as one integrated offering. These factors guide our evaluation. *See Doran v. Petroleum Management Corp., supra,* 545 F.2d at 901 n. 9; *SEC v. Asset Management Corp.,* [1979] Fed.Sec.L.Rep. (CCH) ¶ 97,278 at 96,970 (S.D.Ind. 1979); *Livens v. William D. Witter, Inc.,* 374 F.Supp. 1104, 1107 (D.Mass. 1974). *See also General Life of Missouri Inv. Co. v. Shamburger,* 546 F.2d 774, 782 (8th Cir. 1976). The factors are: (a) whether the offerings are part of a single plan of financing; (b) whether the offerings involve issuance of the same class of securities; (c) whether the offerings are made at or about the same time; (d) whether the same kind of consideration is to be received; and (e) whether the offerings are made for the same general purposes.

■ Applying these factors to the undisputed facts, we conclude that the offerings of limited partnership interests must be considered integrated. We reach this conclusion despite the difficulty detailed above in determining who was the issuer of the securities in question. As we explained in the introduction to this section of the opinion, *supra,* Intertie is not technically the issuer of the securities here. Nonetheless,

---

12. *See also* Schwartz, The Private Offering Exemption—Recent Developments, 37 Ohio St. L.J. 1, 8–11 (1976).

because Murphy developed the scheme for selling partnership shares as a financing mechanism for Intertie, which was responsible for the success or failure of the ventures, we must look to Intertie in evaluating the listed factors.

All but the third factor militate in favor of finding integration. The separation in time from one system offering to the next suggests that the offerings were not integrated, but that factor is heavily outweighed by the remaining considerations. Clearly, the offerings were all made for the same general purpose: they were part of one financing plan which Murphy aptly described, "to give dollars to the cable operating company that could be used at a cost they could live with." To the extent that we can define classes of securities that are not stocks or bonds, the securities at issue here—all limited partnership interests—are of the same class. Finally, the consideration for all partnership shares was the same, cash and notes secured by the particular cable systems purchased.

Thus, factually and legally, the trial court on summary judgment was bound to conclude that the offerings were integrated. While the trial court did not make a specific finding or conclusion on the issue of integration, we must infer that it considered the offerings to be integrated, since it concluded that Intertie was the issuer and that the offerings constituted one placement and the offerees only one group. When we look at the number of purchasers in the aggregate, as we must, their number—400— clearly suggests a public offering rather than a private placement.

### (2.) *The Sophistication of the Offerees*

It was also incumbent upon Murphy to introduce evidence to rebut the inferences of lack of investor sophistication that the court could have drawn from Murphy's deposition testimony. His statement that 60 percent of the investors used offeree representatives suggests at least that the majority of the purchasers, if not the majority of the offerees, lacked the sort of business acumen necessary to qualify as sophisticat-

ed investors. Moreover, Murphy's admission that offeree representatives who were also salesmen and general partners in the cable systems did not disclose this relationship to prospective investors suggests the inadequacy of the representatives. His further testimony that some of the offeree representatives whom he met were incompetent reveals both that the investors needed the protections of the Act and that Murphy and Intertie were not concerned about investor sophistication. Intertie did not obtain information about the investors in the limited partnerships, nor did it insist that ISC do so. Murphy merely stated that Intertie relied on ISC to qualify the investors, but he did not produce evidence suggesting that ISC actually took any such steps.

Because the SEC introduced little evidence on the sophistication question, Murphy's burden in resisting summary judgment on this issue was not a great one. Nevertheless, he failed to adduce any evidence on the issue of investor sophistication and, therefore, failed to meet even his limited burden.

### (3.) *The Size and Manner of the Offering*

If an offering is small and is made directly to the offerees "rather than through the facilities of public distribution such as investment bankers or the securities exchanges," a court is more likely to find that it is private. *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 689. The SEC's evidence shows that the amounts invested in individual systems varied, but that the purchase price for several of the systems was more than $1 million each. Viewed individually, these offerings cannot automatically be labeled small; and there is reason to believe that they should not be viewed individually in any case. When we consider the placements as one integrated offering, we are confronted with a sale of $7.5 million in securities. Without question, that is a sizeable offering, and it is one that we are inclined to consider as public, absent a significant showing that the investors did not

need the protection of the Act, *SEC v. Ralston Purina Co., supra*, 346 U.S. at 125, 73 S.Ct. at 984.

**(4.)** *The Relationship Between the Issuer and the Offerees*

■ A court may only conclude that the investors do not need the protection of the Act if all the offerees have relationships with the issuer affording them access to or disclosure of the sort of information about the issuer that registration reveals. *Lively v. Hirschfeld, supra*, 440 F.2d at 633; *see Doran v. Petroleum Management Corp., supra*, 545 F.2d at 901–02. *See also Parvin v. Davis Oil Co., supra*, 524 F.2d at 118. As with the other requirements discussed, after the SEC demonstrated that the requisite relationship did not exist, it was incumbent upon the defendant to produce evidence that the offerees had available the necessary information.

The information required is quite extensive:

Schedule A of the Securities Act, 15 U.S.C. § 77aa (1958), lists 32 categories of information that should be included in a registration statement. This type of information is designed to protect the investor by furnishing him with detailed knowledge of the company and its affairs to make possible an informed investment decision. A purchaser of unregistered stock must be shown to have been in a position to acquire similar information about the issuer.

*United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 678 (4th Cir.), *cert. denied*, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967) (footnote omitted). Included in this information is the use of investor funds, the amount of direct and indirect commissions, and accurate financial statements. Intertie supplied almost none of this required information. In addition, there were a number of general facts of enormous importance regarding Intertie's operations that were omitted. Operating memoranda purported to show cash flow projections for individual systems but did not reveal that no system would be self-sus-

taining; thus offerees did not know that because of Intertie's large short-term debt obligations, the continued viability of Intertie depended upon a consistent influx of new capital. These omissions contrast sharply with the Act's requirements for provision of information.

The SEC introduced Murphy's testimony that he often refused to provide financial information about Intertie. Murphy also testified that no one disclosed the one-half percent commission that he received or any of the commission above 10 percent that was paid.

Thus, other considerations aside, because the offerees clearly lacked access to financial information about Intertie, we would have to sustain the court's entry of summary judgment on this ground alone. *See SEC v. Asset Management Corp., supra*, [1979] Fed.Sec.L.Rep. at 96,970; *Mason v. Marshall*, 412 F.Supp. 294, 300 (N.D.Tex. 1974) (each finding no private offering where investors did not have access to the type of information included in a registration statement); *cf. Doran v. Petroleum Management Corp., supra*, 545 F.2d at 909 (remanding for trial on question of the availability of issuer information to the offerees); *Bayoud v. Ballard, supra*, 404 F.Supp. at 423 (finding a private offering where investors received prospectus-like information about the issuer, B & C Corporation). *See also SEC v. Ralston Purina Co., supra*, 346 U.S. at 125–26, 73 S.Ct. at 984–85.

**b.** *Private Offering Exemption: Rule 146*

The offers and sales also were not exempt under Rule 146, 17 C.F.R. § 230.146, adopted by the SEC in 1974. The Rule requires that the issuer and any person who offers or sells securities on his behalf have "reasonable grounds to believe" that the offeree is capable of evaluating the prospective investment or able to bear the economic risk. Rule 146(d)(1). If the offeree becomes a purchaser, he either must be capable of evaluating the investment or he must have a competent advisor and be able to

bear the economic risk. Rule 146(d)(2). The discussion above resolves these issues against the defendant. Moreover, each offeree must have access to the kind of information required in Schedule A of the 1933 Act, 15 U.S.C. § 77aa. Rule 146(e)(1). No one furnished the offerees here with such information, and no one provided them access to Intertie's financial statements. In addition, contrary to the requirements of Rule 146(a), the issuer had no reasonable grounds to believe: (1) that offeree representatives were not affiliates or employees of the issuer of the securities; and (2) that the material relationships between the offeree representatives and the issuer had been disclosed to the offerees in writing. Thus, the trial court correctly found that the SEC was entitled to prevail as a matter of law on Murphy's claimed Rule 146 exemption.

### 4. *Offered or Sold in a Transaction by an Issuer, Underwriter or Dealer*

Section 4(1) of the Securities Act of 1933, 15 U.S.C. § 77d(1) (1970), exempts securities from registration requirements if they are not offered or sold in a transaction by an issuer, underwriter or dealer. Murphy contends that he was not an issuer, underwriter or dealer and that, therefore, he is entitled to a § 4(1) exemption. Nearly three decades ago, the Second Circuit addressed a similar contention. In *SEC v. Chinese Consolidated Benevolent Association*, 120 F.2d 738, 741 (2nd Cir.), *cert. denied*, 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497, the court specifically rejected the argument that Murphy makes here:

> Even if the defendant is not itself "an issuer, underwriter, or dealer" it was participating in a transaction with an issuer, to wit, the Chinese government. The argument on behalf of the defendant incorrectly assumes that Section 4(1) applies to the component parts of the entire transaction we have mentioned and thus ex-

empts defendant unless it is an underwriter for the Chinese Republic.

*Id.* at 741. *See SEC v. Culpepper*, 270 F.2d 241, 246–47 (2d Cir. 1959). *See also* 1 L. Loss, Securities Regulation 644 (2d ed. 1961).

Section 4(1) was designed to exempt routine trading transactions with respect to securities already issued and not to exempt distributions by issuers or acts of others who engage in steps necessary to such distributions. Preliminary Note to Rule 144, 17 C.F.R. § 230.144 (1979). The section exempts transactions, not persons, *see United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968), *cert. denied*, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969), and it is inapplicable in cases involving a distribution of new securities by an issuer. Clearly, the sales of partnership shares present a case of distribution of securities by an issuer, whether we look to the technical issuer— the partnership itself—or to Intertie. *See Pennaluna & Co. v. SEC*, 410 F.2d 861, 864 n. 1, 868 (9th Cir. 1969), *cert. denied*, 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970); *SEC v. Chinese Consolidated Benevolent Association, supra.*

### B. *Participation*

Although we have rejected Murphy's exemption argument because he need not be an issuer, underwriter or dealer to be held liable for a § 5 violation, we recognize that Murphy's role in the transaction must be a significant one before liability will attach.

When it argued in support of summary judgment, the SEC contended that Murphy was an underwriter because he participated in an offer and sale in connection with the distribution of a security. *See* § 2(11), 15 U.S.C. § 77b(11) (1970). The SEC argued that under Rule 142, 17 C.F.R. § 230.142 (1979),[13] which defines "participation" for

---

**13.** Rule 142 provides:

(a) The terms "participates" and "participation" in section 2(11) shall not include the interest of a person (1) who is not in privity of contract with the issuer nor directly or indirectly controlling, controlled by, or under common control with, the issuer, and (2) who has no association with any principal underwriter of the securities being distributed . .

§ 2(11) purposes, Murphy was an underwriter both because he controlled the issuer (Intertie) and because he had a financial stake in the business of the principal underwriter (ISC) since he was dependent on its sales to provide his commission override and to enhance the value of his common stock in Intertie. The district court concluded that Murphy was an underwriter. Now, on appeal, the SEC abandons the argument that Murphy was an underwriter and argues, instead, that ISC was an underwriter; but it maintains its original conviction that Intertie was the issuer. Building from that conclusion, it asserts that Murphy participated in sales for the issuer.

As we noted earlier, the SEC's argument that Intertie was the issuer is not technically correct; nonetheless, its contention that ISC was an underwriter (a position also

taken by Murphy) may be valid.[14] We need not reach this question, however, because Murphy clearly is already liable as a participant in the transaction.

Section 5 provides that unless a registration statement is in effect, it is unlawful for any person to sell or offer to sell a security.[15] Despite the use of the term "sell," liability under § 5 is not confined only to the person who passes title to the security. Instead, courts have established the concept of "participant" liability to bring within the confines of § 5 persons other than sellers who are responsible for the distribution of unregistered securities.

■ The doctrine of participant liability for those directly responsible for registration violations has developed along two different tracks,[16] each with its own culpability standard.[17] The first track includes

---

(b) As used in this rule—

(1) The term "issuer" shall have the meaning defined in section 2(4) and in the last sentence of section 2(11).

(2) The term "association" shall include a relationship between two persons under which one—

(i) Is directly or indirectly controlling, controlled by, or under common control with, the other, or

(ii) Has, in common with the other, one or more partners, officers, directors, trustees, branch managers, or other persons occupying a similar status or performing similar functions, or

(iii) Has a participation, direct or indirect, in the profits of the other, or has a financial stake, by debtor-creditor relationship, stock ownership, contract or otherwise, in the income or business of the other.

(3) The term "principal underwriter" shall have the meaning defined in Rule 405 [an underwriter in privity of contract with the issuer].

14. ISC's underwriter status does not necessarily depend on a holding that Intertie was an issuer for § 2(11) purposes. We have already shown that the limited partnerships themselves were issuers of the securities in question. These issuers paid to ISC (or sometimes to ISC and Murphy) as commission, from 10 to 13 percent of the amount the limited partners invested for purchase of a system. ISC played a significant role in organizing the partnerships. Its salesmen contacted the investors, promoted the sale of the particular cable system, and put together the partnership. We could conclude from this evidence that ISC was participating in the distribution of the securities within the

meaning of § 2(11) and was, therefore, a § 2(11) underwriter. *See Chinese Consolidated Benevolent Association, supra,* 120 F.2d at 740–41.

15. The terms "offer" and "sell" are defined in § 2(3) of the Securities Act of 1933, 15 U.S.C. § 77b(3) (1970), which provides:

The term "sale" or "sell" shall include every contract of sale or disposition of a security or interest in a security, for value. The term "offer to sell," "offer for sale," or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

16. There also is a third track of liability, which covers those who aid and abet registration violations. Courts defining the standard of liability in those cases have taken inconsistent paths. *See* n. 20, *infra.*

17. It seems anomalous to suggest that "sell" in § 5 should be defined any differently from "sell" in any portion of the Securities Act that provides liability for a violation of § 5 since § 2(3) seemingly defines the term for all purposes, *but cf. Schillner v. H. Vaughan Clarke & Co.,* 134 F.2d 875 (2d Cir. 1943) (holding that the definition of sell is narrower in § 5 than in § 12 because "the context otherwise requires" a narrower definition in § 5), and there can be no violation of the other section (e. g., § 12) without a violation of § 5. Indeed, in other contexts, some courts have suggested persuasively that standards of liability should be broader where SEC enforcement actions are the remedy for a violation. *See SEC v. Aaron,* 605 F.2d 612, 620 (2d Cir. 1979), *rev'd in part,*

cases arising under § 12 of the Securities Act of 1933, 15 U.S.C. § 77*l* (1970),[18] which provides that a person who sells a security in violation of § 5 or by means of a registration statement containing material misrepresentations or omissions should be liable to the buyer in an action for rescission or damages. Under the first track, a defendant is liable if the injury to the plaintiff flowed directly and proximately from the actions of the defendant. *Lewis v. Walston & Co., Inc.,* 487 F.2d 617, 621–22 (5th Cir. 1973); *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 692–93 (5th Cir. 1970); *Nicewarner v. Bleavins,* 244 F.Supp. 261, 266 (D.Colo.1965); *Lennerth v. Mendenhall,* 234 F.Supp. 59, 65 (N.D.Ohio 1964).

In assessing proximate cause, courts focus first on whether a defendant's acts were the actual cause of the injury, i. e., whether "but for" the defendant's conduct, there would have been no sale. *Nicewarner v. Bleavins, supra,* 244 F.Supp. at 266 (D.Colo.1965); *see Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 693; *Lennerth v. Mendenhall, supra,* 234 F.Supp. at 65. A finding of "but for" causation, alone, does not satisfy proximate cause, however. *See Nicewarner v. Bleavins, supra,* 244 F.Supp. at 266; R. Jennings & H. Marsh, Securities Regulation 1096 (4th ed. 1977); W. Prosser, Handbook

of the Law of Torts 238–39, 244 (4th ed. 1971). Prior to the issuance of a security, numerous persons perform mechanical acts without which there could be no sale. For example, a printer may prepare key documents or a bank may advance cash to a customer upon the customer's presentation of an instrument and then pass the instrument to another person. Both would satisfy a "but for" causation test, but these acts nonetheless do not render the defendants sellers. *See First Trust & Savings Bank v. Fidelity-Philadelphia Trust Co.,* 214 F.2d 320 (3d Cir. 1954); Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U.Pa.L.Rev. 597, 646 (1972). Before a person's acts can be considered the proximate cause of a sale, his acts must also be a substantial factor in bringing about the transaction. *Lewis v. Walston & Co., Inc.,* 487 F.2d 617, 621–22 (5th Cir. 1973). *See* Restatement (Second) of Torts § 431 (1965). Thus, a defendant will be held liable as a participant under § 12 if his acts were both necessary to and a substantial factor in the sales transaction. *See Lewis v. Walston & Co., Inc., supra,* 487 F.2d at 621–22.

The second track of participant liability has been laid in SEC enforcement actions brought to obtain injunctions for violations of § 5. In these cases, those who had a necessary role in the transaction are held

---

—— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (The Supreme Court did not reach the issue of whether the policy underlying the Securities Act supports wider liability in SEC injunction actions, because it reversed the lower court on the issue of statutory requirements for an SEC injunction against fraud violations.); *SEC v. Coven,* 581 F.2d 1020, 1027–28 (2d Cir. 1978) ("The essential nature of an SEC enforcement action is equitable and prophylactic; its primary purpose is to protect the public against harm, not to punish the offender.").

**18.** Courts first extended liability under § 12 beyond those in privity of contract with the buyer by including brokers. *Murphy v. Cady,* 30 F.Supp. 466 (D.Me.1939), *aff'd,* 113 F.2d 988 (1st Cir.), *cert. denied,* 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940); *see Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1053 (2d Cir. 1969). Next, the definition of seller expanded to encompass any defendant who participated in

any phase of an overall plan to market securities. *Wonneman v. Stratford Securities Co., Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 90,923 (S.D.N.Y. 1959). After trial, the *Wonneman* court narrowed the doctrine to exclude those who were "strangers" to the illegal sales and to limit § 12 liability to the seller and those who negotiated the sales. *Wonneman v. Stratford Securities Co., Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 91,034 (S.D. N.Y.1961).

Finally, the courts rejected the broad participation concept from the first *Wonneman* decision, concluding that it would hold liable virtually every person who participated in the events leading up to the transaction, even if this connection were remote or incidental and, instead, settled on the proximate cause test. *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 692–93 (5th Cir. 1971), *see Lennerth v. Mendenhall,* 234 F.Supp. 59, 65 (N.D.Ohio 1964).

liable as participants.[19] *SEC v. North American Research & Development Corp.,* 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper,* 270 F.2d 241, 247 (2d Cir. 1959); *SEC v. Chinese Consolidated Benevolent Association,* 120 F.2d 738, 741 (2d Cir. 1941). *See also SEC v. International Chemical Development Corp.,* 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna & Co. v. SEC,* 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969).[20]

This "necessary" participant test is equivalent to the first prong of the proximate cause analysis detailed above: it essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place.[21] Conceivably, this

19. The Second Circuit developed the test in *SEC v. Chinese Consolidated Benevolent Association, supra.* The court held that the association, which had no official or contractual relation with the Chinese government for whose bonds it solicited orders, was liable as an underwriter for violating § 5 of the Securities Act. Next, the court concluded that, even if the association were not liable as an underwriter, it was liable as a participant:

> Section 5(a)(1) . . . broadly prohibits sales of securities irrespective of the character of the person making them. The exemption is limited to "transactions" by persons other than "issuers, underwriters or dealers." It does not in terms or by fair implication protect those *who are engaged in steps necessary to the distribution of security issues.*

*SEC v. Chinese Consolidated Benevolent Association, supra,* 120 F.2d at 741 (emphasis added). The court engaged in the foregoing analysis in response to the argument (discussed in subsection II.A.4 of this opinion, *supra*) that the association was exempt under § 4(1) of the Act because it was not an issuer, underwriter or dealer. The court was not specifically addressing the question whether the association had violated § 5 as a seller. Nonetheless, we must assume that the opinion resolves the "seller" issue, as well, since selling is a prerequisite to § 5 liability. Elsewhere in the opinion, the court indicated its cognizance of the sale requirement when it held that a party who solicits offers to buy securities is a seller under the Act whether he is acting for the issuer (as normally occurs) or the purchaser (as in the case presented there). Thus, succeeding courts have interpreted the *Chinese Consolidated* case as establishing that a defendant is liable for a § 5 violation if he engages in steps necessary to the distribution. *SEC v. North American Research & Development Corp., supra,* 424 F.2d at 81 (holding also that participation must not be so slight as to be de minimis); *Pennaluna & Co. v. SEC, supra,* 410 F.2d at 864 n.1, 868.

20. One SEC enforcement case used an apparently different standard, although the opinion does not spell out the court's reasoning. In *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 809–10 (2d Cir. 1975), the court held that an attorney who was a director of the issuer corporation and who approved management communications was liable for a § 5 violation because his acts enabled another to offer shares for sale to the public. While the case is consistent with the *Chinese Consolidated* line of decisions, the opinion does not cite *Chinese Consolidated* but, instead, relies on *SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541 (2d Cir. 1973), in which the same court earlier had held an attorney liable as a secondary participant.

Secondary liability for aiding and abetting is the third track of participant liability, and the scope of liability widens and narrows from case to case. Courts have articulated various tests for secondary participant liability. *See, e. g., SEC v. Spectrum, Ltd., supra,* 489 F.2d at 541; *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1046 (2d Cir. 1976); *SEC v. Dolnick,* 501 F.2d 1279, 1282–83 (7th Cir. 1974); *Lorber v. Beebe,* 407 F.Supp. 279, 287–88 (S.D.N.Y. 1975); *SEC v. National Bankers Life Insurance Co.,* 324 F.Supp. 189 (N.D.Tex.1971), *aff'd,* 448 F.2d 652 (5th Cir. 1971). Murphy could be held secondarily liable under any secondary liability standard, *see SEC v. Asset Management Corp.,* [1979] Fed.Sec.L.Rep. (CCH) ¶ 97,278 at 96,969 (S.D.Ind.1979); but we need not determine the appropriate standard for secondary liability here or draw a fine line between primary and secondary liability, *In re Caesar's Palace Securities Litigation,* 360 F.Supp. 366, 380 (S.D.N.Y. 1973), because the concept is designed for fringe defendants, Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U.Pa.L.Rev. 597, 645–46 (1972). Murphy, in contrast, is liable as a direct participant.

21. Despite the similarity, the two tracks of cases cross only once, in a case involving a broker's liability under § 15 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o (1970). In *Wasson v. SEC,* 558 F.2d 879, 885–86 (8th Cir. 1977), the defendant broker urged the court to adopt a narrow definition of sell under § 5, and he looked to decisions under § 12 for the standard. He asked the court, however, to reject the § 12 standard as widening the definition of sell beyond the bounds necessary to a § 5 violation prosecuted under § 15. *Id.* at 885. Without alluding to the SEC enforcement participant cases, the court rejected the *Hill York* test not because of its breadth but because it "fails to . . . focus the trier of fact's attention on those policies . . . the Act was designed to implement." *Id.* at 886. Accordingly, the court propounded its own test which focused on whether the defendant was uniquely

broader standard could encompass a party whose acts in furtherance of the distribution were de minimis and who should not be held liable for registration violations. *See Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1053 (2d Cir. 1969). But in practice, the standards differ little, for no court using the "necessary participant" test has found liable a defendant whose acts were not a substantial factor in the sales transaction. *See SEC v. International Chemical Development Corp., supra ; SEC v. North American Research & Development Corp., supra ; Pennaluna & Co. v. SEC, supra ; SEC v. Culpepper, supra ; SEC v. Chinese Consolidated Benevolent Association, supra.*

▪ We need not decide which standard we would apply, because Murphy is clearly liable under either. The conclusion that Murphy engaged in steps necessary to the distribution is inescapable. He devised the corporate financing scheme for Intertie, without which there would have been no limited partnerships. He prepared and reviewed offering memoranda; he met personally with broker-dealers, investors and their representatives; and he spoke at broker-dealer sales seminars. There can be no gainsaying the importance of these acts: Murphy's extensive role in facilitating the transactions clearly was a substantial factor in the sales of unregistered securities.[22] Thus, the district court properly held Murphy liable as a participant in the offer and sale of unregistered securities.

### III. JUDGMENT AFTER TRIAL ON THE FRAUD COUNTS

Murphy argues that error in the trial court's ruling on the summary judgment motion also invalidated the judgment after trial on the fraud count. Because the summary judgment ruling was correct, Murphy's argument fails.

Murphy also contends that the court erred in finding him liable for securities fraud because his omissions were not material and because he did not act with scienter. These contentions are meritless.[23]

---

positioned to ask relevant questions, acquire material information, or disclose his findings. *Id.*

**22.** Murphy's acts, in fact, are quite similar to those of the defendants in *Hill York* and in *Wasson. See Wasson v. SEC,* 558 F.2d 879, 887 (8th Cir. 1977); *Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d at 693.

**23.** At oral argument, counsel for Murphy also argued that proof of reliance was essential to 10b–5 liability and that the SEC had not proved reliance at trial. Reliance, however, is not a necessary element in actions for securities fraud when the fraudulent act charged involves an omission. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) ("Under the circumstances of this case,. involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."); *Zweig v. Hearst Corp.,* 594 F.2d 1261, 1271 (9th Cir. 1979); *Rifkin v. Crow,* 574 F.2d 256, 263 (5th Cir. 1978).

This conclusion is not impaired by the Supreme Court's decision in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). *See generally,* H. Pitt, Chiarella Court: Limits on Novel 10b–5 Ac-

tions, Legal Times of Washington (March 31, 1980). While it seems that the majority opinion interprets *Affiliated Ute Citizens* quite narrowly, 445 U.S. at 250–251, 100 S.Ct. at 1125–26 (Blackmun, J., dissenting), the portion of *Affiliated Ute Citizens* that it restricts is that which had been thought to permit imposition of liability for omissions absent a fiduciary relationship between plaintiff and defendant. *Id.; see Zweig v. Hearst Corp., supra,* 594 F.2d at 1268. Reliance continues to be unnecessary to 10b–5 liability for material omissions after *Chiarella. Chiarella v. United States, supra.* Moreover, even if reliance were necessary, Murphy could not obtain reversal by raising the point at oral argument when he failed to raise the issue below.

Nor does *Chiarella's* establishment of a "duty" requirement in omission cases save Murphy. The Court held that § 10(b) liability for silence in connection with the purchase or sale of securities "is premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Id.,* —— U.S. at ——, 100 S.Ct. at 1115. As the architect of the investment scheme, Murphy unquestionably had such a duty at the time of his negotiations with prospective purchasers of limited partnership shares. *See id.,* at —— n. 8, 100 S.Ct. at 1114 n. 8 (discussing with approval *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961): "The Commission embraced the reasoning of Judge Learned Hand that 'the di-

We have already recited numerous significant facts about Intertie and its role in the success of the cable systems that Murphy and Intertie failed to reveal. There can be no doubt that a reasonable investor would consider this omitted information important in making an investment decision. *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1266 (9th Cir. 1979), *citing TSC Industries v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273, 1293 (9th Cir. 1979); *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 15 (2d Cir. 1977); *Lewelling v. First California Co.*, 564 F.2d 1277, 1279 (9th Cir. 1977). Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge. *See SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358 n. 9 (9th Cir. 1973); *SEC v. Universal Service Association*, 106 F.2d 232, 239 (7th Cir. 1939), *cert. denied*, 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519 (1940). A prospective purchaser of a limited partnership interest would have considered it quite significant that the viability of the entity in which he was investing was dependent on the ability of Intertie continuously to generate new capital and that the promised tax shelter might prove more illusory than real. Thus, Murphy's argument that we should hold the district court's finding of materiality clearly erroneous is frivolous.

There is greater substance to Murphy's assertion that a court may not enjoin him from violating the fraud provisions of the securities laws unless it finds that he acted with scienter. *See SEC v. Aaron*, —— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). While the law of this circuit at the time of oral argument did not support his contention, *see SEC v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979), the Supreme Court recently held that the SEC could not obtain an injunction for violations of § 10(b), Rule 10b–5, or § 17(a)(1) absent proof of scienter. *SEC v. Aaron, supra.* Murphy insists that the requisite scienter was absent, and he therefore asks us to set aside the injunction.

Because the law was unclear at the time of suit,[24] the district court assumed that scienter was required and, accordingly, denied the SEC's motion for summary judgment on the fraud counts and required trial. After trial, the court found that Murphy had willfully and knowingly obtained money through material misrepresentations and omissions, in violation of § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1970); § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1970); and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1979), promulgated thereunder.

Before the Supreme Court's decision in *Aaron*, it was the law of this circuit that a court might issue an injunction under § 17(a) without a showing of intent to defraud. *SEC v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979). The SEC urged this court to adopt a similar standard for 10b–5

---

rector or officer assumed a fiduciary relation to the buyer for the very sale; for it would be a sorry distinction to allow him to use the advantage of his position to induce the buyer into the position of a beneficiary although he was forbidden to do so once the buyer had become one.' *Id.*, at 914 n. 23, *quoting Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir.), *cert. denied*, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).")

24. Before the Supreme Court decided the question, the circuit courts were divided on the issue of scienter requirements for SEC injunctions for violations of Rule 10b–5 and § 17. *Compare SEC v. Aaron*, 605 F.2d 612 (2d Cir. 1979); *SEC v. World Radio Mission, Inc.*, 544 F.2d 535 (1st Cir. 1976); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 809 (2d Cir. 1975); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1096 (2d Cir. 1972); *SEC v.*

*Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (scienter not required in SEC enforcement action under Rule 10b–5), *with SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978) (scienter required in SEC enforcement action under Rule 10b–5); and *compare SEC v. Blazon Corp.*, 609 F.2d 960, 965 (9th Cir. 1979); *SEC v. Coven*, 581 F.2d 1020, 1026–28 (2d Cir. 1978); *SEC v. American Realty Trust Co.*, 586 F.2d 1001 (4th Cir. 1978); *SEC v. World Radio Mission, Inc.*, 544 F.2d 535, 541 n. 10 (1st Cir. 1976) (scienter not required in SEC enforcement action under § 17(a)), *with Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979) (scienter required in SEC enforcement action under § 17(a)(1) but not under § 17(a)(2) and (a)(3)).

injunctions, but it recognized that we need not reach the 10b–5 issue if we upheld the injunction under § 17(a), as we did in *Blazon*. Alternatively, the SEC argued that this court need not reach the issue of scienter requirements at all, because the district court had found that Murphy did act with scienter. The Supreme Court's decision in *SEC v. Aaron, supra,* forecloses the SEC's first suggested route and partially forecloses the second. We do agree with the remainder of the SEC's argument, however; and we uphold the injunction both because we concur in the district court's finding that Murphy acted with scienter and because the defendant violated § 17(a)(2), as to which an injunction may issue without proof of scienter. *SEC v. Aaron, supra,* —— U.S. at ——, 100 S.Ct. at 1955.

The district court denominated Murphy's acts "willful" and "knowing." This court has suggested that willfulness indicates an aggravated level of intent. *Nelson v. O. E. Serwold,* 576 F.2d 1332, 1337 (9th Cir. 1978) [25]; and the *Aaron* opinion stated specifically that § 10(b) and Rule 10b–5 proscribed "knowing or intentional misconduct," —— U.S. at ——, 100 S.Ct. at 1952, *citing Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 197–99, 96 S.Ct. at 1382–84. Clearly, then, the district court could not

have chosen terms more surely indicating a finding of scienter.[26] The evidence to which we have adverted repeatedly throughout this opinion amply supports the court's finding.

In addition, the district court's description of Murphy's acts very nearly tracks the language of § 17(a)(2), which proscribes "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." § 17(a)(2), Securities Act of 1933, 15 U.S.C. § 77q(a)(2) (1970). Thus, while the district court stated that it found a violation of § 17(a) without specifically indicating which portions of § 17(a) Murphy violated, it is clear that the court found a violation of § 17(a)(2). It is also clear that its conclusion in this respect was correct. Thus, we sustain the judgment of the trial court on all the fraud counts.

## IV. *PERMANENT INJUNCTION AGAINST REGISTRATION VIOLATIONS*

■ Another of Murphy's claims of error is that the trial court improperly grant-

---

**25.** In *Nelson v. O. E. Serwold, supra,* we said:

> The district court . . . stated . . . that the evidence did not justify a finding that the defendants "deliberately and cold-bloodedly set out to conceal information which 10b–5 requires to be provided." The language "deliberately and cold-bloodedly" suggests willfulness or a particularly aggravated intent.
>
> The question remains whether the lower court found the defendants merely negligent, or whether it found their conduct more culpable than mere negligence, yet short of willful intent to defraud.

*Id.* at 1337.

We recognize that the term "willfully" is "construed at least as diversely as it is spelled," 2 L. Loss, Securities Regulation 1309 (2d ed. 1961), depending upon the context in which the term is used. *See generally* Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U.Pa.L.Rev. 597, 636–38 (1972). Nonetheless, we have no doubt that the district court adopted the word to indicate that the defendant acted with the intent that *Ernst & Ernst v.*

*Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) requires. *See* n. 26, *infra.*

**26.** Our conclusion that the district court intended to indicate that it found a high degree of scienter is buttressed by two other facts. The district court denied summary judgment on the fraud count precisely because it concluded that proof of scienter was required before it could issue an injunction. It also concluded that recklessness might not be a sufficient basis for finding scienter. (Later decisions of this court, however, have established that recklessness may satisfy scienter requirements and give rise to § 10b–5 liability for damages. *Spectrum Financial Cos. v. Marconsult, Inc.,* 608 F.2d 377, 381 (9th Cir. 1979); *Nelson v. O. E. Serwold,* 576 F.2d 1332, 1338 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).) Thus, it is clear that the district court's language was designed to describe a serious level of intent. For a discussion of the meaning of scienter, *see* Bucklo, The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder, 29 Stan.L. Rev. 213 (1977).

ed a permanent injunction against future violations of the registration requirements on summary judgment without hearing testimonial evidence. The SEC correctly points out that permanent injunctions may be granted on summary judgment, given the proper record. *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 903 (5th Cir. 1980), as amended, Fed.Sec.L.Rep. (CCH) ¶ 97,301; *SEC v. Bonastia*, 614 F.2d 908, 913 (3d Cir. 1980), as amended, Fed.Sec.L.Rep. (CCH) ¶ 97,276; *Latta v. SEC*, 356 F.2d 103, 103 (9th Cir. 1965), *cert. denied*, 384 U.S. 940, 86 S.Ct. 1459, 16 L.Ed.2d 539 (1966). *See SEC v. Research Automation Corp.*, 585 F.2d 31, 36 (2d Cir. 1978). The critical question, however, is not whether a court may issue a permanent injunction on summary judgment without hearing testimonial evidence, but whether the SEC, as the moving party here, clearly established the absence of any genuine issue of fact material to the granting of the injunction. *SEC v. Koracorp Industries, Inc.*, 575 F.2d 692, 697–98 (9th Cir.), *cert. denied sub nom. Helfat v. SEC*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978); 6 Moore's Federal Practice ¶ 56.15[4] (1979).

■ In order to obtain a permanent injunction against Murphy, the SEC had the burden of showing there was a reasonable likelihood of future violations of the securities laws. *United States v. W. T. Grant Co.*, 345 U.S. 629, 635, 78 S.Ct. 894, 899, 97 L.Ed. 1303 (1953); *SEC v. Research Automation Corp., supra*, 585 F.2d at 36; *SEC v. Koracorp Industries, Inc., supra*, 575 F.2d at 697; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d at 1082, 1101 (2d Cir. 1972). The existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction. *SEC v. Koracorp Industries, Inc., supra*, 575 F.2d at 698. In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violations, *SEC v. Koracorp Industries, Inc., supra*, 575 F.2d at 699; *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977), and it considers

factors such as the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations. *SEC v. Bonastia, supra*, 614 F.2d at 912; *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

■ The Commission's evidence was more than adequate to support the injunction here. The above-listed factors militate strongly in favor of granting an injunction. The district court's summary judgment ruling indicated that defendant had, at the least, acted recklessly in violating the registration provisions. As established through Murphy's own admissions, these violations occurred repeatedly, but Murphy nonetheless insisted that he had done nothing wrong. In addition, his new venture, Xanadex, provides ample opportunity for continued misconduct. A brochure prepared for a Xanadex limited partnership offering reveals the likelihood of future violations:

> Mr. Stephen W. Murphy is Chairman of the Board and President of Xanadex Corporation. Mr. Murphy in September of 1971 founded Intertie, Inc., an operating management company of 38 cable television systems, serving in excess of 50,000 subscribers in 17 states. He was responsible for the development of a unique financing method, which was instrumental in the rapid growth of Intertie, to purchase CATV properties utilizing limited partnerships in a sales-leaseback transaction. He was also responsible for initiating and organizing the financing of Intertie's projects. *Mr. Murphy formed Xanadex to expand the basic financing mechanism to finance other management groups within the cable industry and communication field.*

(Emphasis supplied).

The only problematic factor in our assessment is the sincerity of Murphy's assur-

ances against future violations. Murphy presented the trial court with an affidavit in which he stated that he intended to comply with the registration requirements in the future. The issue for this court is whether Murphy's statements of reformation were sufficient to preclude summary judgment. We conclude that they were not.

Murphy argues that such statements of reform give rise to an inference that there will be no future violations. *See SEC v. Koracorp Industries, Inc., supra,* 575 F.2d at 698. The SEC counters that there was no need for an evidentiary hearing merely so that Murphy might repeat his promises on the stand. The Commission cites *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1124 (5th Cir. 1978), for the proposition that where the trial will be to the court, it may decide mixed questions of law and fact on summary judgment if a trial will not enhance its ability to draw inferences from the undisputed facts. *Nunez* is not controlling here, however, because Murphy's credibility is at issue, and the *Nunez* court acknowledged that the court's ability to draw inferences is enhanced by a trial where credibility is an issue.

Nonetheless, Murphy's argument cannot prevail. One obvious problem with his position is that it implies that a defendant may always defeat a permanent injunction on summary judgment if he merely states under oath that he will not commit violations in the future. If the SEC were to resolve all other issues on summary judgment, such a rule could prevent the Commission from attempting to gain permanent injunctions on motions for summary judgment in those cases when the clearest violations have been committed.

We cannot sanction a rule that would establish such a ritualistic dodge around a permanent injunction on a motion for summary judgment. To do so would elevate the factors that courts have enumerated for consideration to the status of individual prerequisites to the issuance of a permanent injunction. That the factors are not individual prerequisites is clear from an examination of the cases in which courts have approved the granting of injunctions. *See, e. g., SEC v. Bonastia, supra,* 614 F.2d at 912–13; *SEC v. Aaron, supra,* 605 F.2d at 623–24; *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir. 1978); *SEC v. Universal Major Industries Corp., supra,* 546 F.2d at 1048; *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1100–01; *cf. SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975) (citing the district court's observation that injunctive relief is not barred by a defendant's disclaimer of an intent to violate securities laws in the future). As we indicated earlier, the totality of the circumstances is the appropriate focus of inquiry. *See* Comment, Scienter and SEC Injunction Suits, 90 Harv.L.Rev. 1018, 1026–27 (1977).

In the present proceeding, the totality of the circumstances strongly suggests the need for an injunction. Murphy stated that he took all precautions he thought reasonable to keep from violating the registration requirements. Nevertheless, the court found that he did violate them. The fact that he violated the requirements once when he did not intend to do so is sufficient to justify the conclusion that he might do so again, even if the court believed he was sincere in his protestations to the contrary. Moreover, his continued insistence that he has done nothing wrong indicates that he may commit similar errors in the future, particularly since he has not expressed an intention to cease dealing in limited partnerships.[27] *See SEC v. Koracorp Industries, Inc., supra,* 575 F.2d at 698; *SEC v. Research Automation Corp., supra,* 585 F.2d at 36; *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1101.

---

27. Instead of arguing that he will cease making securities offerings, Murphy argues that his affidavit shows that he did not take part in the distribution of partnership interests, that he was exempt, and that the offerees did not require the protection of the Act; then he concludes, "[My] effort . . . shown above to abide by the law shows that [I] will abide by the law in the future." We agree with the district court that Murphy's arguments warrant the opposite conclusion.

This case is clearly distinguishable from *SEC v. Koracorp Industries, Inc., supra,* on which Murphy relies heavily. In *Koracorp,* this court reversed the grant of a summary judgment for *defendants* on the injunction issue, because there was tremendous dispute about the culpability of each of the defendants, in addition to the question of the bona fides of their statements of intent to comply. It was impossible for the trial court on summary judgment to balance the culpability against the statement of reformation. In Murphy's case, however, his culpability for the registration violation was established conclusively, and the trial judge could properly decide that he would grant the permanent injunction whether he believed Murphy or not.

Murphy also attacks the breadth of the injunction, arguing that the court's requirement that he mail copies of the order to his business associates in Xanadex and his investors in Intertie is punitive and is, therefore, an abuse of discretion. The Second Circuit addressed similar claims in *SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1102, and, after observing that there is a dearth of authority regarding the appropriate scope of injunctive relief in SEC enforcement actions, *id.,* concluded that a court could look beyond the securities at suit and order the defendant to refrain from violations with respect to other securities. *Id.*

The district court here directed Murphy to furnish copies of its decree to his present and future associates in Xanadex because it wished to provide actual notice of the decree to persons who might act in concert with Murphy to violate the securities laws

in the future. The court properly added this requirement in order to bind other parties to the terms of the injunction. *See* Fed.R.Civ.P. 65(d).

Requiring provision of copies to current investors in limited partnerships associated with Intertie was also an appropriate exercise of the court's discretion. The "standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." *Hecht Co. v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); *see SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1102; *Los Angeles Trust Deed & Mortgage Exchange v. SEC,* 285 F.2d 162, 182 (9th Cir. 1960), *cert. denied,* 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (1961). Assuring the investors' awareness of matters affecting their investment which came to light in the litigation is undoubtedly within the public interest.

## V. DENIAL OF MURPHY'S RULE 41(b) MOTION

At the close of the SEC's case, Murphy moved for dismissal under Rule 41(b),[28] arguing that upon the facts and the law, the SEC had not shown a probability of future violations, which was a prerequisite to injunctive relief. Murphy also suggested that the testimony of the SEC's witnesses supported his contention that he was not liable for fraud. The court denied the 41(b) motion and cut off Murphy's argument on the issue because it concluded that the SEC had established a prima facie case for relief. Murphy contends that this ruling deprived him of due process because the court ap-

---

**28.** Rule 41(b) provides:

*Involuntary Dismissal: Effect Thereof.* For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of facts

may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

plied an incorrect standard and should have permitted further argument. We conclude that the court's ruling on the 41(b) motion was correct, notwithstanding its use of an incorrect standard, and that the district court properly exercised its discretion when it terminated Murphy's argument on the subject.

■■■ We may quickly dispose of the latter issue. Murphy's counsel argued in support of the 41(b) motion for several minutes before the court asked how long he anticipated continuing. When he replied that he planned to speak for another 10 or 15 minutes, the court cut off further argument and denied the motion. The court's interruption did not violate the defendant's right to due process, and defendant's apparent suggestion that a judge may not limit argument in support of meritless contentions borders on the ridiculous.

■■■ Murphy's attack on the district court's ruling on the 41(b) motion requires more extended analysis. Typically, the court should adjudicate the case on the merits in ruling on a 41(b) motion. *See Ewing v. Camacho,* 441 F.2d 1142 (9th Cir. 1971); *Ellis v. Carter,* 328 F.2d 573 (9th Cir. 1964); *Barr v. Equitable Life Assurance Society,* 149 F.2d 634 (9th Cir. 1945). Here, the trial judge stated that he was denying Murphy's motion because the SEC had made a prima facie case. A trial court, however, may grant a Rule 41(b) motion even if the plaintiff has made out a prima facie case, so long as the court is convinced that the evidence preponderates against the plaintiff. *Southern Arizona York Refrigeration Co. v. Bush Manufacturing Co.,* 331 F.2d 1, 6 (9th Cir. 1964); *Ellis v. Carter, supra,* 328 F.2d at 577; *Island Service Co. v. Perez,* 309 F.2d 799, 803 (9th Cir. 1962); *Huber v. American President Lines,* 240 F.2d 778, 779 (2d Cir. 1957).

Accordingly, Murphy argues that the court used an erroneous standard and that we should reverse the ruling. The SEC responds that while the standard may not have been the proper one for most cases, this court in *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974), established a "prima facie case" standard for Rule 41(b) motions in 10b–5 cases. The SEC contends that because of the nature of the Rule 10b–5 cases, where much of the evidence needed to prove the plaintiff's case is in the hands of the defendant, a plaintiff need only establish a prima facie case to survive a Rule 41(b) motion. *Id.* at 729.

The SEC's reliance on *White* is misplaced. The issue before the court there was whether a jury could properly convict a person for securities fraud without any finding of fault; and we held that there could be no liability absent a breach of a duty owed by defendant to plaintiff.[29] In surveying prior decisions of this circuit, the court in *White* was compelled to distinguish *Royal Air Properties, Inc. v. Smith,* 312 F.2d 210, 212 (9th Cir. 1962), where it had stated that a prima facie case of liability under Rule 10b–5 only requires proof of a material misstatement or omission in connection with the purchase or sale of a security. The court stated: "A prima facie case, as we used the term in *Royal Air,* consists of sufficient evidence *in that type of case* to get plaintiff past a motion for a directed verdict in a jury case or motion to dismiss pursuant to Fed.R.Civ.P. 41(b) in a non-jury case. It is the evidence necessary to require a defendant to proceed with his case."[30] *White v. Abrams, supra,* 495 F.2d at 729 (emphasis in original). The court in *White* described the limitations of a prima facie case only in order to demonstrate that

**29.** In *White v. Abrams,* we established a "flexible duty standard" for determining civil liability in 10b–5 cases. We directed courts to determine whether defendant owed a duty to plaintiff by assessing variables such as the relationship of plaintiff to defendant. *White v. Abrams, supra,* 495 F.2d at 735. To the extent that we permitted liability based on negligence, the case is no longer good law. *Ernst & Ernst*

*v. Hochfelder,* 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 1381 & n. 12, 47 L.Ed.2d 668 (1976).

**30.** For a comparison of the role of the court in deciding motions under Rule 41(b) and motions for a directed verdict, *see* 5 Moore's Federal Practice ¶ 41.13[4] at 41–193 (1979); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2371 at 219 (1971).

the *Royal Air* standards for a prima facie case were not the sole prerequisites to ultimate liability. The issue of the appropriate standards for evaluating a Rule 41(b) motion was not then before the court.

As indicated earlier, courts that have confronted that issue uniformly have concluded that a trial court may grant a Rule 41(b) motion notwithstanding plaintiff's proof of a prima facie case, so long as the evidence preponderates against the plaintiff. We agree, however, with the admonition of the Fifth Circuit that in such circumstances a trial court should be reluctant to grant the motion except in clear cases because an appellate reversal for error in granting the motion may require an entire new trial. *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 793 n. 19 (5th Cir. 1975); *White v. Rimrock Tidelands*, 414 F.2d 1336, 1340 (5th Cir. 1969); *see White v. Abrams, supra*, 495 F.2d at 729–30. Because the defendant possesses much of the evidence needed by the plaintiff to prove his case, the plaintiff may well be able to make up on cross-examination for any deficiencies in his case in chief. *Id.* at 730. Therefore, we cannot accept Murphy's implied argument that if the court finds only a prima facie case, it must grant the Rule 41(b) motion. No court has ever so held. Rather, the trial judge may exercise discretion and deny the motion even where technically he might have granted it. 5 Moore's Federal Practice ¶ 41.13[4] at 41–192 (1979).

In addition, Rule 41(b) by its own terms allows the trial judge to "decline to render any judgment until the close of all the evidence." Murphy asserts that this is what the district court should have done. A denial, however, means nothing more than a refusal to enter judgment at that time.[31] *K. King & G. Shuler Corp. v. Petitioning Creditors*, 427 F.2d 689, 690 (9th Cir. 1970). It makes no difference whether the court expressly reserves decision on the merits or denies it. *Id.*; 9 C. Wright & A. Miller, Federal Practice and Procedure

§ 2371 at 222 (1971). In either case, if Murphy sought to obtain direct review of the denial without consideration of his evidence, he could only do so by refusing to put on any evidence and, instead, resting, as he did, at the close of plaintiff's case.

Moreover, as the SEC correctly points out, Murphy was not prejudiced by the district court's application of an incorrect standard. The court weighed the evidence at the close of the case (which occurred right after the court denied the 41(b) motion) in the same manner that it would have had it applied the proper standard. When it did so, it properly concluded that the evidence of past violations and of likelihood of future violations preponderated against Murphy. Thus, it is clear that denial of Murphy's Rule 41(b) motion is the correct result.

The judgment of the district court is AFFIRMED.

---

31. Of course, defendant cannot obtain review of a denial if he proceeds to offer proof of his case. *United States v. Doyle*, 468 F.2d 633, 635 (10th Cir. 1972); *K. King & G. Shuler Corp. v. Petitioning Creditors*, 427 F.2d 689, 690 (9th Cir. 1970).