**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Sherwin P. BROWN, Jamerica Financial, Inc., and Brawta Ventures, LLC, Defendants.**

**Civil No. 06–1213 (JRT/FLN).**

United States District Court, D. Minnesota.

Sept. 30, 2008.

1230

Robert M. Moye, John J. Kaleba, Charles K. Kerstetter, and Erik J. Lillya, United States Securities & Exchange Commission, Chicago, IL, for plaintiff.

Julie H. Firestone and Matthew D. Forsgren, Briggs & Morgan, PA, Minneapolis, MN, for defendants.

## ORDER ADOPTING REPORT AND RECOMMENDATION

JOHN R. TUNHEIM, District Judge.

This case is now before the Court on the objections of Sherwin P. Brown and Jamerica Financial, Inc. (collectively, "defendants") to a Report and Recommendation issued by United States Magistrate Judge Franklin L. Noel on June 12, 2008. After a *de novo* review of those objections, *see* 28 U.S.C. § 636(b); Local Rule 72.2(b), the Court adopts the Report and Recommendation of the Magistrate Judge.

### BACKGROUND

Defendant Jamerica Financial, Inc. ("Jamerica") is registered with the Securities and Exchange Commission ("SEC") as an investment adviser. (Answer at ¶ 8.) Jamerica provides investment advisory services and portfolio management services to more than 250 clients across several states. (*Id.* ¶ 5.) Defendant Sherwin P. Brown ("Brown"), a resident of St. Paul, Minnesota, is the President and 50% owner of Jamerica. (*Id.* ¶ 6.) Brown controls Jamerica and provides investment advisory services to its clients. (*Id.*) Jamerica charges a fee to its clients based on the size of a client's investment, but that fee rate is capped at 1.5%. (*Id.* ¶ 10.)

In or about May 2004, Brown organized Brawta Ventures, LLC ("Brawta"), a purported private investment firm. (*Id.* ¶ 11.) Brown was Brawta's general managing partner. (*Id.* ¶ 7.) Brown marketed shares directly to clients of Jamerica, and initially charged $10,000 per share. (*See* Swanson Decl. at ¶¶ 2–5; Pickhartz Decl. at ¶¶ 1–4; Smith Decl. at ¶¶ 1–5.) However, Brown did not provide these investors with any written disclosures before they invested in Brawta. (*See* Swanson Decl. at ¶ 3; Pickhartz Decl. at ¶ 3; Smith Decl. at ¶ 3.) Brown told some investors that Brawta

would operate like a mutual fund and invest in publicly traded stocks, (*see* Pickhartz Decl. at ¶ 3), and told others that it would operate as a venture capital fund and invest in start-up companies. (*See* Smith Decl. at ¶ 3.) Brawta investors also recall hearing inconsistent explanations for how Brown would be compensated. In one case, Brown indicated that he would not charge a separate fee for managing Brawta, but rather would receive compensation from the fees that the investors were paying to Jamerica. (Smith Decl. at ¶ 4.) In another case, Brown indicated that he would receive a percentage of any Brawta profits that exceeded $1 million, but would not receive money from Brawta otherwise. (Swanson Decl. at ¶ 4.) In a third case, investors believed that Brown would simply receive a percentage of the assets under Brawta's management. (Reinert Dep. at 103.) No investors, however, recall being informed before the initiation of this lawsuit that any funds from their Brawta accounts had been withdrawn to pay fees or management expenses. (*See* Swanson Decl. at ¶¶ 2–5; Pickhartz Decl. at ¶¶ 1–4; Smith Decl. at ¶¶ 1–5.)

Between May 2004 and January 2006, approximately fifty-three investors invested a total of approximately $1.62 million in Brawta. (Compl. at ¶¶ 7, 12.) The SEC alleges that Brown was solely responsible for selecting Brawta's investments, (*Id.* ¶ 7), and declarations from former Brawta clients indicate that Brown stated this in his marketing pitch. (*See* Swanson Decl. at ¶ 3; Pickhartz Decl. at ¶ 3; Smith Decl. at ¶ 3.) In addition, Brown had sole signature authority over the Brawta bank account. (*See* Javorski Decl. at ¶ 8.)

An accountant employed by the SEC has prepared summaries of Brawta's financial activities. (*See* Javorski Decl., Docket No. 4) The accountant indicates that between May 24, 2004, and August 17, 2004, $240,406 was withdrawn from the Brawta account and deposited into Brown's personal checking account. (*Id.* ¶ 10.) Later, between November 29, 2004, and January 3, 2006, $265,500 was withdrawn from the Brawta account and deposited into a Jamerica account. (*Id.* ¶ 11.) This transfer was accomplished by writing a check from the Brawta account to purchase an official U.S. Bank check, which was then deposited into the Jamerica account. (*Id.*) Between November 10, 2004, and February 13, 2006, an additional $216,050 was withdrawn from the Brawta account and deposited into the Jamerica account. (*Id.* ¶ 12.) This transfer was accomplished with a check written on the Brawta account to Wells Fargo Bank and by customer counter withdrawals, followed by deposits into the Jamerica account. (*Id.*) On June 30, 2005, an additional $15,000 was withdrawn from the Brawta account and deposited into Jamerica's account. (*Id.* ¶ 13.) This transfer was accomplished with a check written on the Brawta account to purchase an official U.S. Bank check, which was then deposited into Jamerica's account. (*Id.*) In addition, between June 17, 2004, and February 13, 2006, an additional $110,177 was withdrawn from the Brawta account, by checks payable to U.S. Bank. (*Id.* ¶ 14.) While the SEC accountant was unable to pinpoint the manner in which these funds were expended, he notes that these transactions were similar to those discussed above, in that checks were written to banks rather than payees. (*Id.*)

The SEC's accountant indicates that all of these transfers typically came at times when either Brown or Jamerica were running low on funds. (*Id.* ¶¶ 19–20.) The SEC also indicates that following the transfers to Jamerica, thousands of dollars in payments from Jamerica's account were made to the Apple Store, a lawn care service; Polo/Ralph Lauren; Coach; Cir-

cuit City; Helzberg Diamonds; Netflix; and Victoria's Secret. (*Id.* ¶ 42.)

Finally, on July 11, 2005, a Brawta check in the amount of $22,500 was written to Timothy Gullickson. (*Id.* ¶ 15.) Gullickson indicated that this check was intended as payment for a personal loan to Brown from 2002. (*Id.*, Gullickson Dep. at 13–29.) On March 2, 2006, after the SEC had begun investigating Brown, Brown called Gullickson to discuss this check. (Gullickson Dep. at 28.) Brown "hinted" that if Gullickson was asked about the check, he should indicate that it was payment for "investment advice" or for "help[ing] him in choosing stocks for his mutual fund." (*Id.*) Gullickson "thought [Brown] was asking [him] to tell a lie," and reported the conversation to his employer. (*Id.* at 29–31.) Gullickson's employer then reported the incident to the National Association of Securities Dealers ("NASD"). (Docket No. 207 Attach. 22.) In sum, the SEC's accountant concludes that approximately $869,633 was transferred out of the Brawta checking account for non-investment purposes. (Javorski Decl., Docket No. 4 at ¶ 16.)

On February 27, 2006, the SEC began an investigation of Jamerica. (Karlin Decl. at ¶ 3.) During that investigation, the SEC requested documents detailing Brawta's activities. (*Id.* ¶¶ 8–9, 17.) Brown was unable to produce complete bank records for the Brawta account, a list of Brawta's investments, or any documentation describing how Brawta's asset value was determined. (*Id.* ¶¶ 9, 17.) Brown's counsel also conceded that no written disclosures concerning Brawta had been given to its investors. (*Id.* ¶ 8.) Finally, Brown stated that no fees for the management of Brawta had been taken from Brawta's funds, and that all fees for managing Brawta were collected as part of the fee charged by Jamerica. (*Id.* ¶ 6.) In addition, the most recent books and rec-

ords that the defendants produced for Jamerica were only current through December 31, 2004. (*Id.* ¶ 5.) The general ledgers for Jamerica contained funds diverted from Brawta that were falsely characterized on the ledger as capital contributions from Brown. (*See* Javorski Decl., Docket No. 5 ¶¶ 51–52.) Finally, defendants have not disputed that Jamerica's account statements overstated the value of Brawta's shares while their value dropped to approximately 50% of the original purchase price by December 2005. (*See* Javorski Decl., Docket No. 108 ¶ 15.)

On March 29, 2006, the SEC filed this action in federal district court, alleging violations of sections 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act"), *see* 15 U.S.C. § 77q(a)(1)-(3); section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), *see* 15 U.S.C. § 78j(b); Rule 10b–5 promulgated under the Exchange Act, *see* 17 C.F.R. § 240.10b–5; sections 206(1)-(2) of the Advisers Act, *see* 15 U.S.C. § 80b–4, 80b–6(1)-(2); and Rule 204–2 of the Advisers Act, *see* 15 U.S.C. § 80b–4. The SEC also alleges that Brown aided and abetted Jamerica's violations of the Advisers Act.

On the date that this action was filed, the defendants were ordered to submit an accounting of Brawta's financial activities. (*See* Docket No. 10.) According to that accounting, $865,389.76 of Brawta's funds had been invested. (Siiro Decl. at ¶ 9.) The accounting added, however, that Brawta had made "unallocated payments" totaling $877,236.16. (*Id.*) Those payments included $145,400 transferred to a checking account in Brown's name, (*see id.*; Javorski Decl., Docket No. 5 at ¶ 16), a total of $521,483 to Jamerica accounts (*see* Siiro Decl. at ¶ 9; Javorski Decl., Docket No. 5 at ¶¶ 17–18), and a total of $210,353.16 transferred to destinations that could not be identified. (Siiro Decl. at ¶ 9)

On April 30, 2007, Brown's counsel was advised by the United States Attorney's Office that Brown was the target of a federal grand jury investigation. On the following day, Brown brought a motion for a stay of these proceedings and sought a protective order preventing depositions of the defendants. (*See* Docket No. 117.) On July 16, 2007, United States Magistrate Judge Janie S. Mayeron denied that motion, (*see* Docket No. 167), and this Court later affirmed that order. (*See* Docket No. 216.) On July 25, 2007, Brown appeared for his deposition and asserted his Fifth Amendment privilege. (*See* Brown Dep., Ex. 21.) Brown also refused to testify on behalf of Jamerica or Brawta and refused to produce another witness who could testify on behalf of those entities instead. (*Id.* 151.)

The SEC subsequently moved for summary judgment against Brown and Jamerica.[1] Following a hearing, the Magistrate Judge recommended granting the SEC's motion as to each of its claims. The Magistrate Judge also recommended issuing a permanent injunction preventing future violations of these provisions and disgorging $869,633 from the defendants with prejudgment interest. Brown and Jamerica now object to those recommendations.

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must— by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e).

### II. DEFENDANTS' REQUEST FOR A STAY

The Court first notes that the defendants have renewed their request for a stay of this litigation. As noted above, defendants previously asked this Court to stay these proceedings pending the completion of the Department of Justice's criminal investigation. (*See* Docket No. 117.) The defendants argued that it was unfair to force Brown to face the choice of either (1) invoking his Fifth Amendment rights and risking adverse consequences in his civil action, or (2) engaging in discovery in the civil case and risking conviction. However, because no criminal indictment has been issued in this case—and may never be issued—the defendants' motion was denied. (*See* Docket Nos. 167, 216.); *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir.1995) ("A defendant has no absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege."); *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech.*,

---

1. Brawta is now controlled by a receiver, and the SEC indicates that it anticipates seeking the receiver's consent to an entry of judgment against Brawta in the near future. (Pl.'s Mem. in Supp. Summ. J. at 1 n.1.)

*Inc.,* 886 F.Supp. 1134, 1139 (S.D.N.Y. 1995) (noting that a stay of a civil case is an "extraordinary remedy," and that "stays will generally not be granted before an indictment is issued").

This issue has turned out to be critical in this case, because Brown elected to exercise his Fifth Amendment rights, and has brought forth almost no evidence in his defense. Nonetheless, the Court finds no basis for revisiting this issue here. The issue was fully briefed to United States Magistrate Judge Janie S. Mayeron, and was the subject of a hearing. (*See* Docket No. 155.) Magistrate Judge Mayeron then issued a thorough written memorandum supporting her ruling. (*See* Docket No. 167.) Subsequently, this issue was the subject of another round of briefing after defendants filed objections to the Magistrate Judge's order. This second round of briefing was followed by another written order issued by this Court. (*See* Docket No. 216.) In short, the defendants have had a full and fair opportunity to be heard on this issue. Defendants do not indicate that Brown has been indicted, or that there has been any other change in Brown's circumstances that would impact the reasoning of either this Court or Magistrate Judge Mayeron. Moreover, granting a request for a stay where there has been no indictment risks putting a case on hold indefinitely, a result which is particularly problematic in a case where hundreds of investors were allegedly deprived of considerable sums of money. In those circumstances, the Court declines to amend its prior conclusion. The Court next turns to the impact of Brown's invocation of the Fifth Amendment.

## III. IMPLICATIONS ON THE EVIDENTIARY RECORD OF BROWN'S INVOCATION OF THE FIFTH AMENDMENT

 Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure to bring forward evidence in their defense. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *SEC v. Colello,* 139 F.3d 674, 677 (9th Cir.1998). The Court may not punish a party for invoking the Fifth Amendment, *see SEC v. Merrill Scott & Assocs., Ltd.,* 505 F.Supp.2d 1193, 1208 (D.Utah 2007), and a direct inference of guilt or liability from a party's silence is forbidden. *See LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir. 1995). However, a district court has discretion to fashion a response to a party's invocation of the Fifth that is no more harsh than necessary to prevent unfair and unnecessary prejudice to the other side. *See Colello,* 139 F.3d at 677; *Merrill Scott & Assocs., Ltd.,* 505 F.Supp.2d at 1209. Courts elsewhere have shifted the burden to the defendant to demonstrate an entitlement to disputed funds, *id.;* stricken a counterclaim and an affirmative defense in their entirety, *see United States v. One Parcel of Real Prop.,* 780 F.Supp. 715, 722 (D.Or.1991); and prevented a defendant from offering evidence in support of positions on which he had invoked the Fifth Amendment. *See SEC v. Benson,* 657 F.Supp. 1122, 1129 (S.D.N.Y.1987).

Here, the only evidence brought forward by Brown in response to the SEC's motion is a set of interrogatory responses supplied in April 2007. (*See* Forsgren Aff. Ex. 1.) The Magistrate Judge noted that Brown submitted these responses and then invoked the Fifth Amendment, thereby preventing the SEC from exploring his answers in a deposition. (*Id.*) The Magistrate Judge concluded that it would therefore be "fundamentally unfair" to allow Brown to rely on these responses in opposing summary judgment. (Report and Recommendation at 1242.) The defendants broadly assert that this conclusion was "erroneous[ ]," but cite to no authorities in support of this challenge, and do not offer

any reasoning outside of renewing their argument on the stay issue. That issue has been resolved.

■ This Court agrees that it would be inappropriate to allow Brown to rely on his interrogatory responses in opposing summary judgment. As the Magistrate Judge noted, Brown's invocation of the Fifth Amendment prevented the SEC from exploring and clarifying Brown's responses in a deposition. The significance of that limitation is apparent in light of the content of those interrogatory responses. In response to questions about the transfers of Brawta funds to Brown and Jamerica, Brown merely offered the broad explanation that the transfers were "related to compensation (i.e. management fees), expense reimbursements and consideration for assets transferred into the Brawta fund." (Forsgren Aff. Ex. 1 at 4–5.) This is precisely the sort of general answer on a critical issue that would have been explored in great detail in a deposition. Allowing Brown to rely on it here would allow him to manipulate the discovery process so that his unquestioned, conclusory assertions are the only version of his testimony in the record. *Cf. In re Edmond,* 934 F.2d 1304, 1308 (4th Cir.1991) (approving the striking of a self-serving affidavit where a party had invoked the Fifth Amendment to prevent a deposition); *United States v. Baker,* 721 F.2d 647, 650 (8th Cir.1983) (disregarding direct testimony after a defendant invoked the Fifth Amendment to prevent cross-examination). Thus, in order to prevent unfairness to the SEC, the Court will not consider Brown's interrogatory response in the context of this motion.

## IV. VIOLATIONS OF THE SECURITIES ACT OF 1933 AND THE EXCHANGE ACT OF 1934

■ In counts I–III of its complaint, the SEC alleges violations of Section 17(a)(1), (a)(2), and (a)(3) of the Securities Act ("Section 17(a)"), Section 10(b) of the Exchange Act ("Section 10(b)"), and Rule 10b–5. Each of these statutes prohibits fraud in the sale of securities.[2] To estab-

---

2. Specifically, Section 17(a) states:

It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Under Section 10(b), the SEC has promulgated Rule 10b–5, which states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the state-

lish a violation of Section 17(a)(1), Section 10(b), or Rule 10b–5, a plaintiff must prove scienter. *See Aaron v. S.E.C.,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).[3] Scienter in this context "means the intent to deceive, manipulate, or defraud," *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 741 (8th Cir.2002), and can be proven with evidence of "conduct which rises to the level of severe recklessness." *In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 893 (8th Cir.2002). Such conduct may include "highly unreasonable omissions or misrepresentations involving an extreme departure from the standards of ordinary care, and presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks omitted).

■ Here, the Magistrate Judge determined that the there is no genuine issue of material fact as to whether the defendants violated each provision noted above and did so with "severe recklessness." Defendants now object to that conclusion, arguing that Brown's intent is a question that should be left to a jury. Defendants are correct that questions concerning fraudulent intent are generally inappropriate for summary judgment. *See United States v. Philip Morris USA, Inc.,* 337 F.Supp.2d 15, 24 (D.D.C.2004). Courts have indicated, however, that where there is overwhelming evidence of severe recklessness and the defendants fail to bring forward countervailing evidence, summary judgment for the plaintiff can be appropriate in securities fraud cases. *See, e.g., SEC v. Lyttle,* 538 F.3d 601, 602–05 (7th Cir.2008). The Court agrees with the Magistrate

Judge that this is among the rare cases where such a conclusion is appropriate.

■ The evidence of defendants' recklessness was ably summarized by the Magistrate Judge. The unrefuted evidence demonstrates that Brown received more than $1.62 million for the purpose of investing in Brawta, after Brown indicated to investors that this money would be used for investment purposes. The analysis submitted by the SEC indicates that $496,550 of these funds were transferred to Jamerica; $262,906 were transferred to Brown or used to pay his personal debts; and $110,177 were withdrawn by checks payable to U.S. Bank, with the SEC unable to determine exactly how they were expended. This assessment is consistent with the analysis filed by the defense, which concluded that Brawta had made "unallocated" payments totaling $877,236.16. In addition, the Magistrate Judge noted that Brown attempted to conceal many of these transfers by (1) converting funds to cash by writing checks directly to banks; (2) asking Gullickson to lie about the purpose of the $22,500 payment he received from Brawta; and (3) falsely characterizing contributions from Brawta to Jamerica as a capital contribution from Brown. The evidence also indicates that the accounts where these funds were deposited were later used for personal expenditures listed above. Moreover, Brown does not dispute that he overstated the value of Brawta's shares to its investors after those shares dropped significantly in value. Finally, and significantly, the Magistrate Judge noted that the defendants brought forward no evidence demon-

---

ments made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5.

**3.** Scienter is not a requirement for a violation of either Section 17(a)(2) or (a)(3). *See Aaron,* 446 U.S. at 701–02, 100 S.Ct. 1945.

strating that the transfers in question were for legitimate investment purposes.

The defendants now argue that the Magistrate Judge ignored several possible legitimate purposes for the transfers described above. They argue that (1) Brown transferred "a patent application or applications" to Brawta; (2) the defendants "would be entitled" to management fees for handling Brawta; (3) the defendant would have been entitled to "expenses and start-up costs costs" related to Brawta; (4) the defendant made investments in Artway Media and AmeriPost; and (5) in an exhibit filed with a declaration more than seventeen months ago, an accounting of Brawta's assets appears to include a $95,000 obligation to Jamerica. (*See* Docket No. 108 Ex. 1.) The Court agrees with the Magistrate Judge that these assertions fail to create a genuine issue of material fact.

As to the alleged patent application or applications, the defendants offer a mere one-sentence assertion, without offering any evidence or details concerning the nature of the patent or its value. As to the management fees and business expenses, the defendants offer no specific explanation of what services were provided or what amounts the defendants would have been entitled to, and offer no supporting evidence that such payments actually occurred. As to the Artway and AmeriPost investments, the defendants again fail to identify the nature or amount of these investments. Moreover, both the SEC and the forensic accountant used by the defendants excluded investments in Artway and AmeriPost from their calcula-

tions. (*See* Siiro Decl. ¶ 9; Javorski Decl.) Finally, the defendants have offered no explanation for when or if the alleged $95,000 debt to Jamerica was paid, and no evidence that it was involved in the specific transactions relied on by the SEC's accountant. In sum, while the defendants have suggested several hypothetical explanations for Brawta's unexplained expenditures, they have brought forward no evidence of any kind demonstrating that this was actually the purpose of the transfers in question.[4] The defendants' mere speculation is not enough to create a genuine issue of material fact, particularly when placed alongside the substantial evidence of reckless securities law violations summarized above.[5] Accordingly, this Court adopts the Magistrate Judge's recommendation, and grants the SEC's motion for summary judgment as to defendants' violations of the Securities Act and the Exchange Act.

## V. VIOLATIONS OF THE ADVISERS ACT

The Magistrate Judge also concluded that the defendants violated sections 206(1) and (2) and Rules 204–2(a)(2) and (6) of the Advisers Act. The defendants' only objection to this conclusion is that the Magistrate Judge relied on defendants' violations of the Securities Act and Exchange Act, which are addressed above. The defendants argue that because the Magistrate Judge's recommendation as to those violations must be rejected, the Magistrate Judge's Advisers Act recommendation must be rejected as well. As set forth

---

**4.** The defendants also briefly mention an affidavit purporting to show that Jamerica never charged fees related to investments in Brawta. (*See* Roby Aff., Docket No. 259.) Even accepting this as true, however, there is no evidence in the record that any of the withdrawals discussed above went toward Brawta management fees. Accordingly, this affidavit

is not sufficient to create a genuine issue of material fact.

**5.** The Court also notes that allowing the defendants to rely on such speculation now— after Brown refused to submit to a deposition—would appear to create the same fairness problem noted above, in this Court's exclusion of Brown's interrogatory responses.

above, this Court has adopted the Magistrate Judge's recommendations as to the defendants' Securities Act and Exchange Act violations. Accordingly, the defendants' objection is overruled, and the Court grants the SEC's motion for summary judgment as to the defendants' Advisers Act violations.

## VI. FURTHER RELIEF

### A. Permanent Injunction

▪▪▪ The SEC also seeks a permanent injunction preventing the defendants from future violations of the securities laws addressed above. To obtain such an injunction, the SEC must prove that (1) the defendants violated the law; and (2) "there [is] a *reasonable likelihood* of further violation in the future." *SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir.1990). "In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violations...." *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980). "The existence of past violations may give rise to an inference that there will be future violations...." *Id.* Finally, "permanent injunctions may be granted on summary judgment, given the proper record." *Id.*

Here, the Magistrate Judge concluded that a permanent injunction was appropriate. The Magistrate Judge based this conclusion on the long period of time over which the defendants' continuing violations occurred; Brown's attempts to convince Gullickson to conceal the diversion of Brawta funds; and the fact that Brown has been found in contempt of court for violating the preliminary injunction and asset freeze in this case. The defendants now object to this conclusion, noting that

Brown agreed to the preliminary injunction and asset freeze to the detriment of his family.

▪▪▪ The Court agrees that a permanent injunction is appropriate. While the defendants' agreement to the preliminary injunction and asset freeze was a positive step, sporadic compliance with the securities laws does not preclude an injunction. *See Murphy*, 626 F.2d at 655. Moreover, this agreement carries much less weight when Brown was later held in contempt for violating this preliminary injunction. That violation, in combination with the defendants' series of unlawful transfers, renders an injunction an appropriate remedy. Accordingly, the Court overrules the defendants' objection and adopts the Magistrate Judge's recommendation that an injunction be entered.

### B. Disgorgement with Prejudgment Interest

▪▪▪ The SEC also requests that defendants be disgorged of the $869,633 misappropriated from Brawta. The Magistrate Judge recommends granting this request, and defendants' only objections are based on arguments addressed above. Accordingly, the defendants' objections are overruled, and the Magistrate Judge's recommendation that defendants be disgorged of $869,633 is adopted.[6]

### C. Civil Penalties

The SEC also asks that the defendants be subjected to civil penalties pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act. The SEC asks that it be given an opportunity to brief the issue of civil penalties if its motion for

---

**6.** The defendants also argue that the SEC has been inconsistent in its assessment of the total damages. However, they do not support this assertion with any citation to the record, or with any alternative view of what the total number should be. In those circumstances, this assertion is not a basis for revising the figure recommended by the Magistrate Judge.

summary judgment is granted. The Court agrees that further briefing on this question is appropriate, and has set forth a schedule for that briefing below.

**ORDER**

Based on the foregoing records, files, and proceedings herein, the Court **OVER-RULES** defendants Sherwin Brown and Jamerica Financial's objections [Docket No. 332] and **ADOPTS** the Magistrate Judge's Report and Recommendation dated June 12, 2008 [Docket No. 331] is. Accordingly, **IT IS HEREBY ORDERED** that

1. SEC's motion for summary judgment against Sherwin P. Brown and Jamerica Financial Inc. [Docket No. 206] is **GRANTED.**

2. SEC is ordered to file a brief within 14 days of this order addressing the appropriate civil penalty. The defendants are permitted to file a response within 10 days of the filing of the SEC's brief. The SEC is permitted to file a reply within 7 days of the filing of the defendants' response. The Court will order oral argument on the issue only if the Court determines that such a hearing is necessary.

**REPORT AND RECOMMENDATION**

FRANKLIN L. NOEL, United States Magistrate Judge.

**THIS MATTER** came before the undersigned United States Magistrate Judge on January 31, 2008, on Plaintiff's Motion for Summary Judgment Against Sherwin P. Brown and Jamerica Financial, Inc. [# 206]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Plaintiff's Motion be granted.

**I. FINDINGS OF FACT**

Defendant Jamerica Financial, Inc. ("Jamerica") is an investment adviser registered with the Securities and Exchange Commission ("SEC"). (Answer, Docket No. 22, at ¶ 8.) Defendant Sherwin P. Brown ("Brown") is the President and 50% owner of Jamerica, through which he provided or still provides investment advisory services and portfolio management to over 250 clients. (*Id.* at ¶¶ 5–6.) Jamerica produces revenue by charging fees for the assets it manages. (*Id.* at ¶¶ 5–6.) The fees are capped at a rate of 1.5%. (*Id.* at ¶ 10.)

In March 2004, Brown formed a private investment fund called Brawta Ventures, LLC ("Brawta"). (*Id.* at ¶ 11.) Brown managed Brawta and marketed Brawta to clients of Jamerica. (*Id.*) He sold membership units in Brawta for $10,000 per unit. (Pickhartz Decl., Ex. 1 at ¶ 4; Smith Decl., Ex. 2 at ¶ 5; Swanson Decl., Ex. 3 at ¶ 5.) During 2004 and 2005, Brown raised more than $1.62 million from 53 investors. (Answer at ¶ 12.)

Brown asked Jamerica clients to invest in Brawta during meetings with them. (Ex. 1 at ¶ 3; Ex. 2 at ¶ 3; Ex. 3 at ¶ 3.) Some investors were told that Brawta would invest in start-up companies and others were told that the Brawta would invest in publicly traded stocks. (Ex. 2 at ¶ 3; Ex. 1 at ¶ 3.) The Brawta investors were not provided with offering documents or written disclosure before investing in Brawta. (Ex. 1 at ¶ 5; Ex. 2 at ¶ 6; Ex. 3 at ¶ 6.) Brown made various representations regarding the management fees that would be charged to Brawta. Brown represented to some investors that there would be no fees charged for the management of Brawta, other than the 1.5% fee charged by Jamerica for assets under management. (Ex. 2 at ¶ 4.) One investor was told that a fee would only be charged

if Brawta was profitable. (Ex. 3 at ¶ 4.) Another client believed that a percentage of the Brawta funds would be deducted as a management fee. (Reinert Dep., Ex. 11 at 103.) No investor of Brawta was ever informed that funds had been withdrawn to pay any fees or management expenses. (Ex. 1 at ¶ 7; Ex. 2 at ¶ 8; Ex. 3 at ¶ 8.)

From the inception of Brawta to January 2006, more than $1.65 million was deposited into the Brawta checking account. (Javorski SJ Decl. at ¶ 19.) Brown had sole authority over the Brawta checking account. (Id. at ¶ 8.) Approximately, $869,633 was transferred out of the Brawta checking account for non-investment purposes. (Id. at ¶ 16.) Most of the money was transferred from Brawta to either the Jamerica checking account or Brown's personal checking account; Brown had sole control over both accounts. (Id. at ¶¶ 8, 10–13.) The money was transferred from Brawta in various methods. Some Brawta funds were used to purchase official U.S. Bank checks. (Id. at ¶ 11.) Some Brawta funds were withdrawn by writing checks directly to a bank and other funds were withdrawn through transactions at the customer counter of the bank. Most of these funds were then deposited in either the Jamerica checking account or Brown's personal checking account. (Id. at ¶¶ 12–13.) However, it could not be determined where all the funds had been transferred; approximately $110,177 in Brawta funds were withdrawn through checks written directly to a bank and it is not known where those funds were deposited or how they were used. (Id. at ¶ 14.) All of the transfers occurred at a time when either Jamerica or Brown had very low balances in their accounts and no available credit. (Id. at ¶¶ 19–20.)

One specific transfer from Brawta funds resulted in a payment to Timothy Gullickson for a personal debt owed by Brown. On July 9, 2005, Brown wrote a check from the Brawta checking account to Gullickson for $22,500.00. (Ex. 18.) This check was repayment for a personal loan given by Gullickson to Brown in 2002. (Gullickson Dep., Ex. 17 at 13–14, 19–20.) The words "contract services" were written on the memo line of the check. (Ex. 18.) On March 2, 2006, after Plaintiff had initiated its investigation, Brown called Gullickson to tell him that the $22,500.00 had been drawn from client funds. (Ex. 17 at 25.) Brown asked Gullickson if he would represent that the payment of $22,500.00 was for providing assistance in picking stocks for the mutual funds. (Id. at 28–30.) Gullickson refused Brown's request and promptly reported this conversation to his employer. (Id. at 30–31.) Gullickson's employer informed the National Association of Securities Dealers ("NASD") of the conversation with Brown. (Id.)

In late February 2006, Plaintiff's examination staff conducted an inspection of Jamerica. (Karlin TRO Decl., Docket No. 4 at ¶ 3.) Brown was unable to produce any financial statements or ledgers for Brawta. (Id. at ¶ 9) Brown was unable to provide a complete list of investments that Brawta money had been invested. (Id. at 17.) Brown was also unable to provide complete banking records for the Brawta checking account. (Id. at 9.) Brown represented that no management fees had been charged to Brawta and all fees for managing Brawta were in the form of management fees charged by Jamerica. (Id. at 6.)

During the inspection, the Plaintiff's inspectors found Jamerica's records to be incomplete and only current through December 31, 2004. (Id. at ¶¶ 5, 9.) Brown did produce general ledgers for Jamerica. (Id. at ¶ 19.) The general ledgers for Jamerica contained numerous capital contributions from Brown. (Javorski TRO Decl., Docket No. 4 at ¶¶ 51–52.) However, Brawta funds were the source of these

capital contributions, not Brown, and the ledgers concealed this fact. (*Id.*)

On April 28, 2006, in response to a Court Order [# 99] the Defendant filed an accounting of the financial transactions of Brawta by Craig S. Siiro, CPA. (Siiro Decl., Docket No. 20 at 6.) Siiro reported $666,883 in transfers from the accounts of Brawta to either Brown or Jamerica. (*Id.* at 9.) Siiro also reported $210,353 in money that had been transferred out of Brawta with a destination that could not be determined. (*Id.*) Siiro determined that $865,389.76 of Brawta funds had been used for investment purposes. (*Id.*)

On April 30, 2007, Brown's counsel was advised by the United States Attorney's Office that Brown was the target of a federal grand jury investigation. On the following day, Brown brought a motion for a stay of these proceedings and sought a protective order preventing the depositions of the Defendants. (*See* Docket No. 117.) On July 16, 2007, Magistrate Judge Janie S. Mayeron denied the Defendants' motion. (*See* Docket No. 167.) On July 25, 2007, Brown appeared for his deposition and asserted his Fifth Amendment privilege. (*See* Brown Dep., Ex. 21.) Brown also refused to testify on behalf of Jamerica or Brawta. (*Id.* at 151.) Brown also refused to produce a witness to testify on behalf of Jamerica or Brawta. (*Id.*)

## II. STANDARD OF REVIEW

According to Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to determine whether a certain fact is material, "it is the substantive law's identification of which facts are critical and which facts are

irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

When determining whether to grant a motion for summary judgment, a court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e); *see Anderson,* 477 U.S. at 256, 106 S.Ct. 2505 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

## III. LEGAL ANALYSIS

### A. No Genuine Issue As To Any Material Fact Exists.

Plaintiff has presented this motion for summary judgment with the various types of evidentiary support contemplated under Rule 56(c). In rebuttal to the evidence presented by the Plaintiff, Defendants have only presented answers to interrogatories signed by Brown. Plaintiff asks this Court not to consider any testimonial evidence presented by Brown, including the answers to interrogatories. Plaintiff argues that it would be fundamentally unfair for Brown to refuse to provide deposition testimony, but then produce self-serving testimonial writings in response to this motion. Brown argues that it is fundamentally unfair that he be required to defend himself in this action when he has asserted his Fifth Amendment privilege.

Brown ought not be permitted to assert his Fifth Amendment privilege during a deposition, but then present testimonial evidence, in the way of sworn discovery responses, that cannot be explored during a deposition by the Plaintiff. *See SEC v. Merrill Scott & Assoc., Ltd.,* 505 F.Supp.2d 1193, 1208–12 (D.Utah 2007). In considering whether to permit the Defendants to rely on their sworn discovery responses, "the court must 'carefully balance the interest of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.'" *Id.* at 1209 (citing *SEC v. Graystone Nash, Inc.,* 25 F.3d 187, 192 (3d Cir.1994)). Here, Defendants are only prohibited from presenting testimonial evidence from Brown, such as the answer to interrogatories signed by Brown. Defendants are prohibited from relying on evidence of a testimonial nature from Brown because the Plaintiff was prevented from exploring these testimonial responses when Brown asserted his Fifth Amendment privilege. Prior to this motion, the Court denied the Defendants motion to stay proceedings and stated that Brown does not have an "absolute right not to be forced to choose between testifying in a civil matter and asserting his Fifth Amendment privilege." (Docket No. 216.) The Defendants had sufficient notice that they would have to continue to defend this civil matter and knew that Brown's assertion of his Fifth Amendment privilege would prejudice the Plaintiff. It is fundamentally unfair for Defendants to create an issue of fact based upon sworn discovery responses made before he invoked his privilege.

Defendants have not brought forth any evidence to rebut the evidence presented by Plaintiff. In their memorandum, Defendants attempt to create a genuine issue of material fact only through citation to Answers to Plaintiff's First Set of Interrogatories. Defendants did not present evidence of a non-testimonial nature or attempt to cast the evidence presented by Plaintiff in a different light. This Court does not consider the answers to interrogatories to be sufficient to create a genuine issue of material fact. Since there is no genuine issue of material fact, it is appropriate to consider whether Plaintiff is entitled to judgment as a matter of law based upon the facts as set forth above and in its memorandum.

### B. Plaintiff is Entitled to Summary Judgment on Its Claims.

#### 1. Violations of Section 17(a) of the Securities Act of 1933, Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934.

In the first three counts of the Complaint, Plaintiff alleges violations of Section

17(a) of the Securities Act of 1933 ("Section 17(a)"), Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), and Exchange Act Rule 10b–5 ("Rule 10b–5"). Section 17(a) states:

(a) Use of interstate commerce for purpose of fraud or deceit

It shall be unlawful for any person in the offer or sale of any securities … by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j. Under Section 10(b), Plaintiff has promulgated Rule 10b–5, which states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b–5. Scienter is an element of violations under Section 10(b), Rule 10b–5, and Section 17(a)(1) while it is not a required element under Sections 17(a)(2) and 17(a)(3). *Aaron v. SEC*, 446 U.S. 680, 701–02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). "Scienter means the intent to deceive, manipulate, or defraud." *In re Navarre Corp. Securities Litigation*, 299 F.3d 735, 741 (8th Cir.2002). Scienter can be proven by a showing of "severe recklessness." *In re K-tel Int'l, Inc. Securities Litigation*, 300 F.3d 881, 893 (8th Cir.2002).

The evidence before the Court demonstrates Defendants acted with at least severe recklessness in violating Section 10(b), Rule 10b–5, and Section 17(a). Plaintiff has presented unrefuted evidence that Brown received over $1.65 million to be invested in Brawta. Then, Brown transferred $869,633 from Brawta to either himself or Jamerica. While Brown did not articulate a consistent investment strategy for Brawta, the evidence does show that Brown indicated that the money would be put to an investment purpose. The money

transferred to Brown and Jamerica was not put to any investment purpose. There is no documentation to support any investment purpose for the transfer of funds from Brawta to Brown and Jamerica. Furthermore, the evidence shows that Brown made attempts to conceal the transfers from Brawta by converting the funds into cash by writing checks directly to banks, by asking Gullickson to lie regarding the nature of the payment he received, and by documenting contributions from Brawta to Jamerica as capital contributions from Brown. The evidence shows that Defendants acted in a manner designed to defraud and deceive its clients.

In their memorandum, Defendants argue that a determination of scienter is inappropriate for summary judgment and list a series of legitimate purposes that these transfers represent, such as payments for patents Brown transferred to Brawta and payment of management fees and expenses. However, Defendants have provided no supporting documentation to refute the overwhelming evidence that Defendants acted with the requisite scienter. Defendants also fail to present any evidence demonstrating these transfers occurred for the claimed purpose or that these transfers represented the value of the patents or the amount of expenses and management fees incurred.

### 2. Violation of Sections 206(1) and (2) and Rule 204–2(a)(2) and (6) of the Advisors Act.

In Count IV of the Complaint, Plaintiff alleges that Brown and Jamerica violated Sections 206(1) and 206(2) of the Advisors Act. Section 206 states:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

. . .

15 U.S.C. § 80b–6. In Count V of the Complaint, Plaintiff alleges that Jamerica violated Rule 204–2 under the Advisors Act. In Count VI of the Complaint, Plaintiff alleges that Brown aided and abetted Jamerica in violating Rule 204–2. Plaintiff claims that summary judgment is appropriate under subsections (a)(2) and (6) of Rule 204–2. These subsections require investment advisors to "keep true, accurate, and current the following documents: . . . (2) General and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts. . . . (6) All trial balances, financial statements, and internal audit working papers relating to the business of such investment adviser." 17 C.F.R. § 275.204–2. An investment advisor is defined as under the Advisors Act as

any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities . . .

15 U.S.C. § 80b–2(a)(11).

 The evidence before the Court demonstrates Defendants violated of Sections 206(1) and (2) of the Advisors Act. It is clear, and Defendants do not argue otherwise, that Defendants are investment advisors under the Advisors Act. (Answer at ¶ 8.) The evidence that establishes violations under Section 10(b), Rule 10b–5, and

Section 17(a) supports a finding of a violation under Section 206(1) and (2). Defendants misappropriated client funds and attempted to conceal this misappropriate from their clients.

The evidence before the Court demonstrates Defendants violated of Rule 204–2(a)(2) and (6) of the Advisors Act. When the Plaintiff's examination staff conducted an inspection of Jamerica, Brown was not able to produce current and complete records for Jamerica. Brown was also unable to produce any financial statements or ledgers for Brawta. Since Brown is solely responsible for the management and control of Jamerica, it has been shown that he aided and abetted Jamerica in violating the record keeping provisions of the Advisors Act. It is worthy of note that, even in opposition to this motion, Defendants have not provided complete records. The evidence clearly shows that Jamerica did not maintain the records required by the Advisors Act and Brown is responsible for Jamerica's failure to keep appropriate records.

## C. Plaintiff Is Entitled to the Relief It Seeks Including a Permanent Injunction, Disgorgement with Prejudgment Interest, and Consideration of Civil Penalties.

### 1. Permanent Injunction

Plaintiff seeks a permanent injunction preventing Defendants from future violations of Section 17(a), Section 10(b), Rule 10b–5, Section 206(1) and (2), and Rule 204. In determining whether a permanent injunction is appropriate, the Court must assess whether there is "*a reasonable likelihood* of further violation in the future." *SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir.1990) (citations omitted). The evidence before the Court demonstrates that future violations are reasonably likely and a permanent injunction is appropriate.

Here, Plaintiff has shown numerous instances of misappropriation of funds by the Defendants. The misappropriations occurred over a period of time and through a series of transactions. When faced with an investigation by the Plaintiff, Brown attempted to conceal the misappropriation by asking Gullickson to lie to the Plaintiff. Brown is also still actively working as an investment advisor and has been found in contempt of court for violating the preliminary injunction in this case. (*See* Docket Nos. 291, 321.) The foregoing demonstrates that it is reasonably likely that the Defendants will engage in further violations in the future and a permanent injunction is necessary.

### 2. Disgorgement with Prejudgment Interest

Plaintiff requests that Defendants be disgorged of $869,633 with prejudgment interest, which represents the misappropriated investor funds. It is within the equitable powers of this Court to order the Defendants to be disgorged of the misappropriated funds with prejudgment interest. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972.). Disgorgement with prejudgment interest is appropriate to discourage future violations of the securities laws and to make the investors whole. Disgorgement in the amount of $869,633 with prejudgment interest is appropriate as the Plaintiff has shown that this amount is a reasonable approximation of the misappropriated Brawta funds. *See SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 15 (D.D.C.1998) (citing *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1232 (D.C.Cir.1989)).

### 3. Civil Penalties

The imposition of civil penalties is contemplated in all three statutory regimes that Defendants have violated. Plaintiff

asks the Court to either impose a civil penalty or allow for additional briefing as to the appropriate civil penalty. The undersigned recommends that the parties be allowed to submit additional briefing regarding the issue of the appropriate amount of civil penalties.

## IV. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment Against Sherwin P. Brown and Jamerica Financial, Inc. [# 206] be **GRANTED.**